COMMONWEALTH of Pennsylvania, Appellee

v.

Jerome KING, Appellant.

Superior Court of Pennsylvania.

Submitted Feb. 11, 2008.

Filed Oct. 17, 2008.

Fortunato N. Perri, Jr., Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: ORIE MELVIN, BOWES and COLVILLE,* JJ.

OPINION BY BOWES, J.:

¶ 1 Jerome King appeals the judgment of sentence that was entered after a jury convicted him of first degree murder, criminal conspiracy, and carrying a firearm on the public streets of Philadelphia. Appellant was sentenced to life imprisonment, a consecutive term of twenty to forty years imprisonment, and a concurrent term of twelve to sixty months imprisonment, respectively. After careful review, we affirm.

¶ 2 Appellant and Esheem Haskins were jointly tried before a jury from June 19 through June 23, 2006, for the February 2, 2005 shooting death of Nathaniel Giles. Mr. Giles was shot twice, once in the back of the head and once in the neck. The shooting was in retaliation for Mr. Giles's cooperation in connection with a criminal investigation of Appellant. Special Agent Charles Doerrer of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") testified that he had been investigating the ownership of a handgun that had been used in the Philadelphia County murder of Faheem Thomas–Childs. Special Agent Doerrer interviewed Mr. Giles, who had purchased the gun, and Mr. Giles informed the ATF agent that he had bought the gun for Appellant. The trial court aptly summarized the factual basis for Appellant's jury convictions:

On February 2, 2005, the defendant came up from behind Nathaniel Giles (hereinafter, the victim) and, without no-

tice, shot him in the back of the head. Notes of Testimony (hereinafter, N.T.) at 6/19/06 at 190. Accompanying the defendant was Haskins, who encouraged the defendant to "Shoot him. Shoot him." *Id.* at 217. After the defendant shot the victim in the head, he stepped over the victim and shot him in the neck. *Id.* at 194. The bullet fired into the victim's head was shot from approximately one foot away and entered through the right ear, and ultimately lodged in the other side of the victim's skull. *Id.* at 129, 132. The second shot was fired approximately two feet from the victim's body. *Id.* at 133. This shot split the victim's cervical spine in two, and also ripped through the victim's jugular vein and carotid artery. *Id.* at 134. The victim was pronounced dead at Temple University Hospital. *Id.* at 126.

On July 15, 2004, approximately six and a half months before he was murdered, the victim had gone to the Philadelphia Office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to speak with Special Agent Doerrer about the purchase of a Ruger .45 caliber handgun that had been used to kill Faheem Thomas–Childs.[4] N.T. 6/19/06 at 97–100. The victim was a straw purchaser for his neighbor, the defendant. *Id.* at 107, 118. The victim admitted to Doerrer that one of the guns he purchased for the defendant was a .45 caliber. *Id.* at 227. In his statement, the victim also admitted that he purchased the gun used to kill Faheem Thomas–Childs in May of 2003. *Id.* at 105. Subsequently, in March of 2006, the defendant admitted to a prison cell-mate, Craig Lindsey, that he had previously owned a gun used by Kennell

---

* Retired Senior Judge assigned to the Superior Court.

Spady, one of the men arrested for the Faheem Thomas–Childs murder. N.T. 6/20/06 at 226–227. In fact, Faheem Thomas–Childs was killed by a bullet fired from a .45 caliber gun which was subsequently traced to Giles as the purchaser. *Id.* at 245.

4 This was a very high profile case in Philadelphia, involving the killing of a 10 year old child during his morning walk to school. Faheem Thomas–Childs was caught in the crossfire between warring drug dealers and was fatally struck by one of approximately 50 bullets fired that morning.

Earlier in the evening on February 2, 2005, at around 8:30 p.m., S.T. and F.J.[5] entered a Chinese store on the corner of Stillman and Cambria Streets in Philadelphia. *Id.* at 176. Intending to carry out their food, the two girls had to wait as its preparation was not yet complete. *Id.* at 178. As they waited, Ms. T. exchanged pleasantries with the victim, whom she knew through another person. *Id.* at 180. Ms. T. then saw the victim leave the store on the corner of Stillman and Cambria Streets and begin to speak with another person, later identified as Khalief Alston. *Id.* at 181; 223. Ms. J. also witnessed the victim and Mr. Alston having a conversation outside the Chinese store. N.T. 6/20/06 at 37.

While waiting for their food, both Ms. T. and Ms. J. noticed a car drive up Stillman Street to the corner where it intersected with Cambria Street.[6] After the car stopped for an unusually long time, the girls observed it make a left onto Cambria Street. N.T. 6/19/06 at 183–184; N.T. 6/20/06 at 34–37. Shortly thereafter, both Ms. T. and Ms. J. noticed two males approach the corner of Stillman and Cambria Streets in the direction from which the car they observed had just driven. *Id.* at 186; N.T. 6/20/06 at 39. Each identified these two

men as the codefendants. *Id.* at 186; N.T. 6/20/06 at 40, 71.

5 At the time of trial, Ms. T. and Ms. J. were aged 14 and 16, respectively. N.T. 6/19/06 at 175; N.T. 6/20/06 at 28. Their full names appear in the certified record.

6 Crime scene investigators testified that both the Chinese store and the scene of the crime on the corner of Stillman and Cambria Streets were well lit. N.T. 6/19/06 at 162–163. It was possible to see both into the store, and out of it. N.T. 6/20/06 at 314–318.

As the co-defendants approached the victim from behind, [the defendant] shot him in the head. *Id.* at 188, 190; N.T. 6/20/06 at 39. [The defendant] fired at the victim from a distance close enough to reach out and touch him. N.T. 6/19/06 at 190. In the process of the shooting of the victim, Ms. T. was able to see Haskins'[s] entire face. N.T. 6/19/06 at 204. Ms. J. saw the defendant from the side. N.T. 6/20/06 at 49–50. She also noticed sparks come from the black or silver pistol type gun used by the defendant. N.T. 6/20/06 at 59–61. After being shot, the victim instantly fell over. N.T. 6/19/06 at 193; N.T. 6/20/06 at 41. Ms. J. then saw the victim being shot a second time, though she was not sure where this shot struck the victim. N.T. 6/20/06 at 62. As the defendant shot the victim, both girls saw Haskins standing nearby. N.T. 6/19/06 at 187; N.T. 6/20/06 at 71. Ms. T. heard him scream to the defendant, "Shoot him. Shoot him." N.T. 6/19/06 at 217. Though she witnessed only the defendant shoot the victim, Ms. J. saw Haskins with a gun.[7] N.T. 6/20/06 at 75.

7 At the scene of the crime, police officers found a nine millimeter fired cartridge casing. N.T. 6/20/06 at 243. A nine millimeter, or .38 caliber, bullet specimen was also re-

covered by the medical examiner from the victim's head. *Id.*

After the shooting, everyone fled the scene of the crime. Ms. T. watched the co-defendants leave together in a car. N.T. 6/19/06 at 194, 209–210. Khalief Alston, with whom the victim was talking prior to being shot, ran up Stillman Street. N.T. 6/19/06 at 207. Startled and frightened for their lives, both witnesses also fled and headed to the home of Ms. T. N.T. 6/19/06 at 207; N.T. 6/20/06 at 47–48. Ms. T. recalled running past the victim and seeing him lying motionless, surrounded by a lot of blood. N.T. 6/19/06 at 208–209. Ms. J. related that Ms. T. had screamed in fear after seeing the shooting and continued to cry throughout the ordeal. [N.T.] 6/20/06 at 48. On their way to the home of Ms. T., the girls were almost hit by the car in which the [co-]defendants were fleeing. *Id.* at 52.

Immediately after the crime, Ms. J. went with her aunt to give a statement to Homicide detectives. *Id.* at 154. She also returned to Homicide on two subsequent occasions. On February 23, 2005, Ms. T. went with her mother to give a statement to Homicide detectives. She also returned to Homicide to provide additional information on two subsequent occasions.[8]

---

[8] Ms. T. and Ms. J. both returned to the Homicide Division on March 14, 2005[,] and on April 16, 2005, to provide additional information about the murder they had witnessed. N.T. 6/22/06 at 22, 24, 26–27.

On April 9, 2005, Detective Ron Dove, then of the Central Detectives Division, was working on unrelated matters with his partner, Detective Jim Waring, in the neighborhood where the victim was murdered. Detective Dove spoke with the defendant. N.T. 6/20/06 at 170–171. Noticing his "black T-shirt with a red stop sign on it that said 'Stop Snitching' across it", Detective Dove asked him if the T-shirt was a warning. *Id.* at 175. The defendant answered "Yes", and pointed at the top rear of his shirt which revealed a drawing of a tombstone with the letters R.I.P. on it. *Id.* Detective Dove asked him, "Is that what happens to people who snitch on you?" *Id.* He replied, "Yes." *Id.*

Approximately 20 minutes later, at another location in the neighborhood, Detective Dove saw Haskins, in the defendant's company, and wearing the same "Stop Snitching" T-shirt. *Id.* at 178–179.

Upon learning that the defendant and Haskins were wanted for murder, Detective Dove began looking for them in the neighborhood where the victim was killed. N.T. 6/22/06 at 180. He never again saw them there. *Id.* at 181. On May 6, 2005, based on information provided to the police, Detectives Dove and Waring learned that the co-defendants were staying together in room 312 of a Holiday Inn hotel on City Line Avenue. N.T. 6/20/06 at 182–183. The detectives found the two men in that room and arrested them for the murder of the victim. *Id.* at 184.

Trial Court Opinion, 7/18/07, at 1–5.

¶ 3 In this appeal, Appellant raises five issues for our review:

A. Were the guilty verdicts against the weight of the evidence because the eyewitness testimony was contradictory and unreliable and because a defense witness identified another individual as the shooter?

B. Did the court err in allowing ATF Special Agent Charles Doerrer to not only testify to a statement given to him by the decedent but also to read the statement to the jury verbatim?

C. Did the trial court commit an abuse of discretion in allowing Detective Ronald Dove to testify about a tee shirt the appellant was wearing several months after the shooting of the decedent?

D. Did the trial court err in overruling a motion for a mistrial made following testimony given by Commonwealth witness Craig Lindsey that concerned a comment made by the appellant about someone having been thrown in a river?

E. Did the trial court err in denying a defense motion for a mistrial following an act of prosecutorial misconduct during the testimony of Detective Ronald Dove whereby the prosecutor suggested that the appellant murdered a potential witness named Kevin Ousley?

Appellant's brief at 4.

▉ ¶ 4 Appellant argues that the verdicts were contrary to the weight of the evidence and that a new trial is warranted because: (1) the testimony of the two minor eyewitnesses was inconsistent, contradictory, and unreliable; and (2) no physical evidence linked him to the crimes.

With respect to the weight of the evidence claim, we note that "an allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." *Commonwealth v. Sullivan*, 820 A.2d 795, 805–06 (Pa.Super.2003). "Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 753 (2000). "A new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Sullivan*, 820 A.2d at 806.

*Commonwealth v. Wright*, 846 A.2d 730, 736 (Pa.Super.2004).

¶ 5 As described *supra*, the two eyewitnesses, S.T. and F.J., were inside a Chinese store located adjacent to the murder site. At trial, S.T. testified that she saw Appellant and Haskins arrive together and approach Mr. Giles, who was standing outside of the Chinese store speaking to another person. She further testified that while Haskins stood near a one-way sign, Appellant moved toward Mr. Giles from behind, pointed a gun to the back of his head, and shot him. Mr. Giles fell to the sidewalk, and Appellant stood over him and fired again. F.J. testified likewise that Appellant came from behind Mr. Giles and shot him in head, and after about three seconds, she heard a second gunshot.

¶ 6 The learned trial judge found that contrary to Appellant's allegations of grave inconsistencies and contradictions in the eyewitness testimony, the evidence supported the jury's verdict. The court addressed Appellant's weight-of-the-evidence claim in the following manner:

In the instant matter, the defendant argues that the testimony from two teenage witnesses was so inconsistent and contradictory that, taken in conjunction with defense testimony from Khalief Alston, who identified a killer other than the defendant, it rendered the jury's decision unjust and speculative. However, the jury received testimony from various witnesses who were familiar with the defendant and identified him as one of the men involved in the shooting of Nathaniel Giles. The jury accepted the evidence which had been presented as to defendant's identity, which was a matter solely within their province. "In criminal proceedings, the credibility of witnesses and weight of the evidence are determinations that lie solely with the trier of fact." *Commonwealth v.*

*Williams,* 578 Pa. 504, 854 A.2d 440, 445 (2004), *citing Commonwealth v. Shaver,* 501 Pa. 167, 460 A.2d 742, 745 (1983). Thus, the jury was permitted to accept the girls' testimony, rather than that of Mr. Alston. The jury also heard that the victim had cooperated with an ATF investigation in such a manner that implicated the defendant in another, high profile crime, and furthermore, the jury was presented with evidence of the defendant's close association with his co-defendant and their mutual contempt for snitches in general. In light of the foregoing, it cannot be said that the verdict shocked the conscience. Therefore, the verdict was not against the weight of the evidence.

Trial Court Opinion, 7/18/07, at 6–7. We agree.

¶ 7 We also reject Appellant's assertion that the verdict was infirm because no physical evidence linked him to the crimes. The identification testimony of the two eyewitnesses was sufficient to support Appellant's conviction. *See Commonwealth v. Liverpool,* 294 Pa.Super. 133, 439 A.2d 786 (1982). Based on the well-reasoned trial court opinion and our review of the record, we conclude that the court acted within its discretion when it determined that the verdicts were not against the weight of the evidence and declined to grant a new trial. Thus, no relief is due.

¶ 8 Appellant's next two claims of error are challenges to the admissibility of evidence. On appeals challenging an evidentiary ruling of the trial court, our standard of review is limited. A trial court's decision will not be reversed absent a clear abuse of discretion. *Commonwealth v. Bishop,* 936 A.2d 1136, 1143 (Pa.Super.2007) (citing *Commonwealth v. Hunzer,* 868 A.2d 498 (Pa.Super.2005)). "Abuse of discretion is not merely an error of judgment, but rather where the judg-ment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Id.*

■ ¶ 9 We now turn to Appellant's contention that the trial court erred in admitting into evidence a hearsay statement of Mr. Giles, the deceased victim herein. As noted *supra,* Special Agent Doerrer interviewed Mr. Giles in July 2004 concerning an investigation into the purchase of a .45 caliber handgun used in the killing of Faheem Thomas–Childs. Following a pretrial evidentiary hearing pertaining to the admissibility of evidence, the trial court permitted Commonwealth witness Special Agent Doerrer to read Mr. Giles's statement into evidence. The verbatim rendition revealed that: (1) Appellant solicited Mr. Giles's assistance on two separate occasions to purchase three handguns, a .45 caliber Ruger, another .45 caliber pistol, and a .357 caliber Smith & Wesson; (2) Appellant promised compensation to Mr. Giles in exchange for making the purchases as Appellant could not pass the background checks required to purchase the handguns himself; and (3) Mr. Giles was afraid of Appellant. At the conclusion of Special Agent Doerrer's testimony, the trial court cautioned the jury that the statement was admissible only against Appellant, not against his co-defendant, and that Appellant was not charged in the shooting death of Thomas–Childs. *See* N.T. Trial, 6/19/06, at 120–21. Appellant raised no objection to the limiting instruction so provided.

¶ 10 Appellant posits that Mr. Giles's statement warranted exclusion because it did not fall under any hearsay exception, its admission violated his Pennsylvania constitutional right to confrontation, and its prejudicial effect outweighed the statement's probative value. Appellant's brief at 15–16. The Commonwealth counters

that Mr. Giles's statement was not hearsay since it was offered to prove Appellant's motive for the murder rather than the truth of the matter asserted and that even if the statement had been admitted for its truth, it properly fell under the forfeiture by wrongdoing exception to the hearsay rule. Commonwealth's brief at 9, 13 (citing Pa.R.E. 804(b)(6)).

¶ 11 Initially, we note that to be considered relevant, evidence must have some tendency to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. "Evidence that is relevant may nevertheless be inadmissible if it violates a rule of competency, such as the hearsay rule." *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294, 308 (2002) (citing *Commonwealth v. Myers*, 530 Pa. 396, 609 A.2d 162, 165 (1992)). Hearsay is an out-of-court statement offered to prove the truth of the matter asserted by the declarant. *See Commonwealth v. Puksar*, 559 Pa. 358, 740 A.2d 219, 225 (1999) (citing *Commonwealth v. Griffin*, 511 Pa. 553, 515 A.2d 865, 870 (1986)). "When an extrajudicial statement is offered for a purpose other than proving the truth of its contents, it is not hearsay and is not excludable under the hearsay rule." *Id.* Hence, a statement offered as evidence of motive and not for its truth, is always relevant and admissible. *See Commonwealth v. Fisher*, 572 Pa. 105, 813 A.2d 761, 768 (2002); *accord Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130, 140 (1996); *Griffin, supra* at 871.

¶ 12 In the case *sub judice*, the Commonwealth sought to establish Appellant's retaliatory motive for killing Mr. Giles by showing that Mr. Giles cooperated in the Thomas–Childs murder investigation wherein he revealed potentially incriminating information concerning Appellant. To that extent, the jurors were not asked to believe material details of the two straw arms purchases, that is, the truth of the matter asserted, to comprehend the probative value of Mr. Giles's statement. Indeed, we concur with the Commonwealth's premise that the evidence was highly relevant to establish the motive for the shooting. We therefore conclude that the statement, if it had been offered solely as motive, would not have constituted hearsay and would have been properly admitted. However, since the jury was not instructed with respect to the manner in which such evidence of motive was to be regarded, the statement must be considered as substantive evidence admitted for the truth of the matter asserted, which clearly rendered it hearsay. *See Griffin, supra* (evidence of bank fraud scheme that included out-of-court statements made by victim and third party, who hired defendant to kill victim, was properly admitted as non-hearsay where statements were not admitted to prove truthfulness of conversations but merely to demonstrate that conversations were held, and jury was properly instructed as such); *contra Commonwealth v. Levanduski*, 907 A.2d 3 (Pa.Super.2006) (*en banc*) (where jurors had to believe the text of a letter to grasp what the letter was offered to prove, the letter was deemed hearsay notwithstanding the trial court's limiting instruction to the jury).

¶ 13 The trial court instead relied on an alternate basis for the admission of this testimony by finding that the statement was admissible pursuant to the forfeiture by wrongdoing exception to the hearsay rule. Pa.R.E. 804(b)(6) states, in relevant part:

**Rule 804. Hearsay exceptions; declarant unavailable**

**b) Hearsay Exceptions.** The following statements, as hereinafter defined, are

not excluded by the hearsay rule if the declarant is unavailable as a witness:

(6) *Forfeiture by wrongdoing.* A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

*Comment:* Pa.R.E. 804(b)(6) is identical to F.R.E. 804(b)(6). This exception is new to Pennsylvania law. Effective October 1, 1998, this exception is relatively new to Pennsylvania law, which explains the dearth of instructional decisional law on the matter. Rule 804(b)(6) implicates issues concerning hearsay as well as the right to confront a witness as governed by both the United States and Pennsylvania Constitutions.[1] While *Levanduski, supra,* and *Paddy, supra,* each speak to the rule, neither is on all fours with the matter under consideration herein.

¶ 14 In *Levanduski,* the defendant was convicted of first degree murder as an accomplice and other related offenses. The murder victim was the defendant's husband who had written a letter detailing his suspicions that the defendant and her paramour might kill him. This Court concluded that the letter constituted inadmissible hearsay as it did not fit within any exceptions to the hearsay rule. In rejecting the hearsay exception for forfeiture by wrongdoing, our Court found no evidence to suggest that the defendant and her paramour murdered the victim "to procure his unavailability as a witness at his own murder trial." *Id.* at 19. Conversely, in the instant case, the evidence indicated that Appellant shot the victim to render

him unavailable to testify against Appellant in connection with his illegal arms purchases.

¶ 15 The defendant in *Paddy* was convicted of the murder of a witness who, with some trepidation, had cooperated with the prosecution against Paddy in an earlier homicide. At trial, the Commonwealth offered the witness's statements, obtained during the course of the prior investigation, not for their truth, but as evidence of the defendant's motive to kill the witness and for proving state of mind. On appeal, Paddy claimed that due to trial counsel's ineffectiveness, his trial was polluted with hearsay and irrelevant evidence, and in a post-sentence motion, he further asserted that the witness's statement violated his Sixth Amendment right to confrontation. Satisfied that counsel provided effective stewardship and that the jury heeded the trial court's cautionary instruction with regard to the statements admitted, the Supreme Court found no grounds for relief.

¶ 16 Unlike in the present case where the trial court treated the statement as offered for its truth, the trial court in *Paddy* fully explained to the jury that the witness's statement was offered not for its truth, but for the limited purposes of revealing state of mind and motive. The court further recognized that although Pa. R.E. 804(b)(6) had not gone into effect until three years after Paddy's trial, it found the principle behind the rule persuasive, "noting that, '[t]ime and again, appellate courts have upheld the use of hearsay evidence against a defendant after he has menacingly procured the absence of the witness against him, and then gallingly argued that the evidence previously pro-

---

1. The Sixth Amendment to the United States Constitution provides, in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. CONST. amend. VI. The relevant text of the Pennsylvania Constitution similarly states, "In all criminal prosecutions the accused hath a right ... to be confronted with the witnesses against him...." PA. CONST. art. I, § 9.

vided by this witness must be withheld from the finder of fact.'" *Id.* at 310 n. 10 (quoting Trial Court Opinion at 38). Our Supreme Court's subsequent disposition of Paddy's appeal eliminated the need to address the parameters of Rule 804(b)(6). *Id.* at 310 n. 10.

¶ 17 Consequently, the *Paddy* Court left undecided the precise issue to be resolved herein, which is whether the absent witness's statement is admissible only as evidence pertaining to the events about which the witness would have testified had he not been prevented from doing so or whether such evidence should also be admitted at the defendant's trial for murdering the witness. *Id.* The Court, however, presciently observed, "[A]s to trials conducted after the rule's effective date, the rule appears to negate the traditional hearsay challenge" to such statements. *Id.* This is a position in accordance with the prevailing federal view. Indeed, the applicability of Rule 804(b)(6) to the circumstances of the case before us presents an issue of first impression. Recognizing this, the trial court turned to relevant federal case law and found *United States v. Dhinsa,* 243 F.3d 635 (2d Cir.2001), particularly instructive. We agree.

¶ 18 In *Dhinsa,* the defendant-appellant was convicted by a jury of, *inter alia,* racketeering, racketeering conspiracy, murder, conspiracy to commit murder, threatening to commit murder, kidnapping, mail fraud, and firearms violations. Dhinsa was "the self-professed leader" of a "vast racketeering organization," and his convictions included numerous counts of killing and threatening people who cooperated with police. *Id.* at 643. On appeal, he raised challenges to various evidentiary rulings made by the district court during the trial. Pertinent to our discussion herein, the defendant-appellant argued that the application of Rule 804(b)(6) should be limited to the subject matter of the witness's "testimony to past events or offenses the witness would have testified about had he been available." *Id.* at 652. In rejecting the defendant-appellant's position, the *Dhinsa* Court provided an overview of the Confrontation Clause of the Sixth Amendment, the evolution of the "waiver-by-misconduct-doctrine" codified in F.R.E. 804(b)(6),[2] and the rule's proper application. To determine the admissibility of evidence under the analogous federal rule, federal courts have required that an evidentiary hearing be held outside the jury's presence prior to the admission of the evidence in question. *See id.* at 653. At the hearing, the prosecution must establish by a preponderance of the evidence that: "(1) the defendant (or party against whom the out-of-court statement is offered) was involved in, or responsible for, procuring the unavailability of the declarant ... and (2) the defendant ... acted with the intent of procuring the declarant's unavailability as an actual or potential witness." *Id.* at 653–54.

¶ 19 As noted above, the *Dhinsa* Court was asked to decide the precise question herein, that is, whether Rule 804(b)(6) limits the subject matter of the witness's testimony to that which the witness would have testified had he been available. The Court stated its holding as follows:

In sum, based on the plain language of Rule 804(b)(6) and the strong policy reasons favoring application of the waiver-by-misconduct doctrine to prevent a party from profiting from his wrongdoing, we hold that Rule 804(b)(6) places no limitation on the subject matter of the

**2.** As noted, Pennsylvania's version of the rule is identical to the federal rule; hence, it em- bodies the same principles.

declarant's statements that can be offered against the defendant at trial to prove that the defendant murdered the declarant.

*Id.* at 653.

¶ 20 The logic of this conclusion can be distilled from the synopsis set forth in *Dhinsa:* (1) the essential purpose of confrontation is to secure a criminal defendant's fundamental right to cross-examination; (2) the constitutional right of confrontation, however, is not absolute and may be waived under certain circumstances; and (3) a defendant who engages in willful misconduct that renders the declarant unavailable waives his confrontation right. *Id.* at 651. All Circuit Courts of Appeals considering the matter of a defendant who has removed an adverse witness have similarly concluded that "simple equity" and "common sense" support a forfeiture principle so that "a defendant who wrongfully procures the absence of a witness or potential witness may not assert confrontation rights as to that witness." *Id.* at 652 (quoting *United States v. White,* 116 F.3d 903, 911 (D.C.Cir.1997)). Duly guided, we proceed to determine whether the trial court properly applied the forfeiture by wrongdoing rule in the instant case.

¶ 21 In accordance with the prevailing federal view, the trial court conducted an evidentiary hearing and "found by a preponderance of evidence that [Appellant] was motivated to kill Giles to eliminate the witness that connected him to the Faheem Thomas–Childs' [sic] murder weapon." Trial Court Opinion, 7/18/07, at 10. The court further concluded:

Determining that the important policy question left open by *Paddy* was answered appropriately in federal cases, the Court reasoned that the defendant should not be permitted to escape Giles's testimony after having killed him. To

allow him to do so would reward him for his heinous act. For that reason, the Court found that the defendant had forfeited his right to confront Giles as a witness against him in this case. N.T. 5/25/2006 at 27, 28. Because the defendant forfeited his right to confront Giles, and because Giles'[s] statement fits within the hearsay exception defined in Pa.R.E. 804(b)(6), his objection to the admission of the statement is without merit.

*Id.* at 10–11. Based on the foregoing, we conclude that the trial court exercised reasonable judgment and correctly applied Pa.R.E. 804(b)(6). Thus, the statement was properly admitted at trial.

■ ¶ 22 We now address Appellant's Confrontation Clause issue. First, it is worth noting that if Mr. Giles's statement had been properly admitted as evidence of motive, its admission would not have run afoul of Appellant's right to confront witnesses against him. In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court noted, "The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 1369 n. 9 (citing *Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)). The Court chose to leave the complete definition of "testimonial" for another day; however, the term includes police interrogations and prior testimony at a preliminary hearing, before a grand jury, or at a former trial. *Crawford, supra* at 68, 124 S.Ct. 1354.

■ ¶ 23 Where testimonial evidence is at issue, the Confrontation Clause of the United States Constitution precludes the use of **hearsay** except in the most limited of circumstances. *See id.; see also* n. 1, *supra.* Under *Crawford,* no prior testimonial statement made by a declarant who

does not testify at the trial may be admitted against a defendant unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. *Id.* at 68, 124 S.Ct. 1354. Thus, to ensure the reliability of such evidence, it must be tested "in the crucible of cross-examination." *Id.* at 61, 124 S.Ct. 1354. Significant to our discussion, however, is the United States Supreme Court's acceptance of the rule of forfeiture by wrongdoing on the basis that it "extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability." *Id.* at 62, 124 S.Ct. 1354 (citing *Reynolds v. United States,* 98 U.S. 145, 158–59, 25 L.Ed. 244 (1878)).

■ ¶ 24 Recently, in *Giles v. California,* —— U.S. ——, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), while recognizing the limited applicability of the forfeiture by wrongdoing doctrine, the United States Supreme Court reaffirmed its commitment to the long-held principle that a defendant forfeits his confrontation rights when he intentionally procures the unavailability of a witness. Indeed, F.R.E. 804(b)(6) represents a codification of the common-law forfeiture rule, which "was aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in 'the ability of courts to protect the integrity of their proceedings.'" *Id.* at 2691 (quoting *Davis v. Washington,* 547 U.S. 813, 833–34, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)). More than a decade ago, the D.C. Circuit Court in *White, supra,* poignantly held:

> It is hard to imagine a form of misconduct more extreme than the murder of a potential witness. Simple equity supports a forfeiture principle, as does a common sense attention to the need for fit incentives. The defendant who has removed an adverse witness is in a weak position to complain about losing the chance to cross-examine him. And where a defendant has silenced a witness through the use of threats, violence or murder, admission of the victim's prior statements at least partially offsets the perpetrator's rewards for his misconduct. We have no hesitation in finding, in league with all circuits to have considered the matter, that a defendant who wrongfully procures the absence of a witness or potential witness may not assert confrontation rights as to that witness.

*United States v. White,* 116 F.3d 903, 911 (D.C.Cir.1997). To the extent Pennsylvania has adopted an identical version of the federal forfeiture rule in Pa.R.E. 804(b)(6), our state is committed to the principle espoused therein. We therefore find no merit to Appellant's challenge on either hearsay or Confrontation Clause grounds.

¶ 25 Moreover, in light of Pa.R.E. 804(b)(6) and our reading of *Crawford v. Washington, supra,* we find unavailing Appellant's assertion that he should be granted relief because Article I, Section 9 of the Pennsylvania Constitution affords more expansive confrontation rights than its federal counterpart. Indeed, our Court has recently noted that the Pennsylvania Constitution affords the same protection as its federal counterpart with regard to the Confrontation Clause. *See Commonwealth v. Geiger,* 944 A.2d 85, 97 n. 6 (Pa.Super.2008).

■ ¶ 26 Before leaving this issue, we turn to Appellant's final allegation that the statement's relevance was clearly outweighed by its prejudicial effect, as "it implicated the appellant in other crimes including conspiracy to evade gun purchase laws and the murder of the child." Appellant's brief at 19. In support, Appellant correctly avers that evidence of prior

criminal activity is inadmissible solely to demonstrate a defendant's bad character or criminal propensity. *See, e.g., Commonwealth v. Lark,* 518 Pa. 290, 543 A.2d 491, 497 (1988). Nonetheless, "Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Pa.R.E. 404(b)(2); *accord Lark, supra.* In *Lark,* the Court explained that "this list of 'special circumstances' is not exclusive" and additional exceptions, such as *res gestae,*[3] have been recognized "where the probative value of the evidence outweighs the tendency to prejudice the jury." *Id.* We also note that where other crimes evidence is offered for a legitimate purpose, such as establishing motive, and a limiting instruction is provided, the prejudicial effect of the evidence generally yields to its probative value. *Id.; Paddy, supra* at 307.

¶ 27 In determining whether evidence of other crimes is admissible, courts take into account "a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other." *Lark, supra.* Finally, our Supreme Court has observed,

"[t]he [trial] court is not ... required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged."

*Paddy, supra* at 308 (quoting *Lark, supra* at 501).

¶ 28 Instantly, the Commonwealth elicited Special Agent Doerrer's testimony re-garding Appellant's prior dealings with Mr. Giles as relevant and necessary to establish a motive for the killing. Two teenage girls testified that Appellant approached Mr. Giles from behind, pulled the trigger twice at close range, and killed him. Prior to the shooting, no words were exchanged between Mr. Giles and Appellant or co-conspirator Haskins. The jury also heard contradictory eyewitness testimony from defense witness Khalief Alston, who identified Ernest Cannon as the shooter. N.T. Trial, 6/21/06, at 103–04. The Commonwealth attempted to buttress its case against Appellant by showing that the shooting was in retaliation for Mr. Giles's cooperation with Special Agent Doerrer in the Thomas–Childs murder investigation. As noted, the trial court cautioned the jury that Appellant was not charged in the shooting death of Thomas–Childs in order to counteract the negative inferences that Appellant now complains of on appeal. *See* N.T. Trial, 6/19/06, at 121. Under the circumstances, we find the evidence that Mr. Giles reported the prior gun transactions relevant for purposes other than to show bad character and criminal propensity. As the evidence was probative of Appellant's motive and related a factual background necessary to complete the story, its evidentiary value outweighed any prejudicial effect. Thus, this claim merits no relief.

■ ¶ 29 Appellant next asserts he was unfairly prejudiced by the trial court's admission of testimony concerning a T-shirt Appellant wore several months after the shooting of Mr. Giles. Appellant's assertion stems from the celebrated Thomas–Childs murder trial and the fact that news organizations publicized the same T-shirts

---

**3.** The *res gestae* exception to the general proscription against evidence of other criminal acts is also known as the "complete story" rationale, as such evidence is admissible in order "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." *Lark, supra* at 497 (citations omitted).

in connection with a campaign of witness intimidation. The trial court aptly summarized Detective Ron Dove's testimony regarding the incident that occurred on April 9, 2005, as follows:

Detective Dove spoke with the defendant. N.T. 6/20/06 at 170–171. Noticing his "black T-shirt with a red stop sign on it that said 'Stop Snitching' across it", Detective Dove asked him if the T-shirt was a warning. *Id.* at 175. The defendant answered "Yes", and pointed at the top rear of his shirt which revealed a drawing of a tombstone with the letters R.I.P. on it. *Id.* Detective Dove asked him, "Is that what happens to people who snitch on you?" *Id.* He replied, "Yes." *Id.*

Trial Court Opinion, 7/18/07, at 5.

¶ 30 Under Pa.R.E. 403, relevant evidence "may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." The comment appended to this rule defines unfair prejudice "as a tendency to suggest [a] decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403, *Comment.* In its discretion, the trial court must "determine the proper effect of evidence that may be introduced to support the point the Commonwealth pursues." *Commonwealth v. Dillon,* 592 Pa. 351, 925 A.2d 131, 141 (2007). Detective Dove's testimony was relevant to corroborate the Commonwealth's theory of motive. Mr. Giles cooperated with Special Agent Doerrer. The T-shirt indicated that people who cooperated with police should be killed. Moreover, Detective Dove further testified to observing co-defendant Haskins sporting the identical T-shirt later the same day. In addition to corroborating motive, the testimony supported the Com-

monwealth's claim that Appellant and Haskins conspired to execute Mr. Giles for linking Appellant to the murder of Thomas–Childs. Given the totality of the evidence, including the teenagers' convincing eyewitness testimony, we cannot agree with Appellant that the jury rendered a verdict of guilt based on testimony revealing that Appellant wore a T-shirt with an inflammatory logo. As a result, we rule that the evidence was relevant and admissible and find no abuse of discretion.

■■■ ¶ 31 Appellant's next two assignments of evidentiary error challenge the trial court's denial of a mistrial. Granting a mistrial is an extreme remedy, and we defer to the trial court's discretion on the matter. *See Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75, 94 (2004). " 'A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial.' " *Id.* (quoting *Commonwealth v. Jones,* 668 A.2d 491, 502–03 (1995)).

¶ 32 Appellant alleges that Commonwealth witness Craig Lindsey's testimony required a mistrial. Specifically, Appellant objects to the following exchange during direct examination:

Q: What, if anything, did the defendant, "Lemon," say to you in prison about these matters that we're here for today? [4]

A: Well, he told me a lot. He just basically said—we had a conversation one day in my cell. He was talking about somewhere a particular homicide that happened; somebody got thrown in the river.

N.T. Trial, 6/20/06, at 221. At sidebar, Appellant's counsel joined co-defense counsel in raising an objection and moving

___

4. "Lemon" is Appellant's nickname.

for a mistrial, and the trial court decidedly overruled "any objections." N.T. Trial, 6/20/06, at 226. Appellant now alleges that the jury was exposed to testimony that strongly implicated him in another homicide and that revealed the fact of his incarceration. Significantly, Lindsey's statement did not directly implicate Appellant in any actual wrongdoing; rather, it only indicated that Appellant had actual knowledge of events surrounding another homicide. The Commonwealth immediately directed a more pointed question to the witness in order to elicit the precise testimony it was seeking: "Did you have a conversation about or did you hear "Lemon" speak about the murder of Faheem Thomas–Childs?" *Id.* Thus, no additional testimony was adduced regarding Lindsey's errant response.

■ ¶ 33 Moreover, we agree with the Commonwealth that Appellant's failure to object to the inferential reference to his incarceration results in waiver of the issue. Commonwealth's brief at 24 (citing Pa. R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.")). Appellant's objection at trial was nebulous and certainly did not concern the subject of his imprisonment. Hence, this particular issue was not properly preserved for purposes of appeal. Even addressing the issue on its merits affords Appellant no relief. Lindsey's testimony set the time frame when he and Appellant conversed sometime in March 2006, while Lindsey was in jail awaiting a preliminary hearing on unrelated charges. The jury could have inferred that Appellant's incarceration was related to the offenses for which he was then being tried as his trial occurred in June of the same year. *Cf. Commonwealth v. Johnson*, 576 Pa. 23, 838 A.2d 663, 680 (2003) (noting that "although generally no reference may be made at trial in a criminal case to a defendant's

arrest or incarceration for a previous crime, there is no rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for the crimes charged"). In light of these circumstances, we conclude that Appellant did not suffer prejudice to the extent that he was deprived of a fair and impartial trial. Thus, the trial court did not abuse its discretion by declining to declare a mistrial. Accordingly, this claim must fail.

■ ¶ 34 Finally, Appellant avers that a mistrial was warranted due to an act of prosecutorial misconduct. Specifically, he alleges that during the testimony of Detective Ron Dove, the prosecutor suggested that Appellant murdered a potential witness named Kevin Ousley. The exchange that occurred between the district attorney and Detective Dove established initially that Appellant and Haskins were arrested in a hotel room rented by Kevin Ousley. The trial court sustained Appellant's hearsay objections to queries involving Detective Dove's knowledge of the relationship that existed between Appellant and Mr. Ousley. Then the following dialogue transpired:

Q: Prior to that day, meaning prior to the day that these men were arrested, had you ever seen Mr. Ousley within the neighborhood that we've just talked about . . . ?

A: Yes.

Q: Approximately how many times?

A: Not as many as him. I would say once every three weeks, maybe.

Q: Did you know who Mr. Ousley's friends included? A: I did.

Q: Who do you know to be a friend of Kevin Ousley?

A: Jerome King and Esheem Haskins.

Q: Is Mr. Ousley available for me to subpoena to ask questions about when,

how, and why Mr. King and Mr. Haskins ended up in that hotel room?

N.T. Trial, 6/20/06, at 184–85. At that point, an objection was lodged to which the trial court responded, "That's sustained and it will be stricken." *Id.* at 185. Following a sidebar conversation, the court denied the motion for a mistrial. We concur with the trial court that the challenged exchange fell short of establishing Mr. Ousley's unavailability or associating Appellant with Mr. Ousley's failure to appear as a witness at trial. Before the witness's response, the trial court sustained the objection and struck the question so that the jury would disregard it. Thus, the prosecutor's line of questioning did not so prejudice or pollute the mind of the jury to warrant the grant of a new trial. No relief is due.

¶ 35 For the foregoing reasons, we affirm the judgment of sentence.

¶ 36 Judgment of sentence affirmed.