J-S49004-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KENDALL C. RICHARDSON | |
| Appellant | No. 2204 EDA 2012 |

Appeal from the PCRA Order July 13, 2012
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0000217-2008

BEFORE: OLSON, OTT and STABILE, JJ.

MEMORANDUM BY OLSON, J.:                    **FILED SEPTEMBER 26, 2014**

Appellant, Kendall C. Richardson, appeals from the order entered on July 13, 2012, dismissing his first petition filed under the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. Further, on appeal, Appellant's court-appointed counsel has filed a petition for leave to withdraw as counsel. We grant counsel's motion to withdraw and affirm the order dismissing Appellant's PCRA petition.

In the PCRA court's thorough and well-written opinion, the court summarized the underlying facts and procedural posture of this case. As the PCRA court explained:

> [During Appellant's jury trial,] the following testimony was elicited[.] [The victim in this matter is named Alfredo Suarez (hereinafter "the victim")]. On June 15, 2007, Luis Avila, Jr., the brother of the victim, [] brought [Appellant] to the victim's apartment [on Wayne Street, in Allentown, Pennsylvania,] to purchase marijuana from the victim. At

that time, Melissa Guzman, a [23-year old] woman who rented the [third] floor apartment from the victim[,] was introduced briefly to [Mr. Avila] and [Appellant]. The drug deal occurred and [Mr. Avila] and [Appellant] left the premises. Upon leaving [the victim's] apartment, [Appellant] showed [Mr. Avila] a handgun. Specifically, [Appellant] carried the gun in his waist band and pulled it out far enough for [Mr. Avila] to observe that it was a black revolver. [Appellant] expressed to [Mr. Avila] that he believed it to be a .45 caliber [handgun] and that he possessed the gun for protection.

[O]n June 18, 2007, Jose Cruz, a tenant residing [in the victim's apartment building], heard shots fired [from] within [the building. Mr. Cruz telephoned 911.] At approximately the same time, Stephen Purdue, a witness residing [nearby] . . . heard what he believed to be gunshots and called [911] as well. Mr. Purdue witnessed a male [(who was later identified as Darryl Peterson)] emerge from Wayne Street and quickly run down 13th Street. Then Mr. Purdue observed a second male [(who was later identified as Appellant)] approach the intersection of Wayne and 13th Streets. According to the audiotape of Mr. Purdue's 911 telephone call, Mr. Purdue described this second individual as black and wearing dark clothing and a red cap. . . .

Officer Michael Torres of the Allentown Police Department responded to [the shooting]. While he was approaching 13th Street, he observed a vehicle proceeding northbound flashing its high beams. In full uniform and in a marked police car, [Officer Torres] approached the vehicle and made contact with [Ms. Guzman. Ms. Guzman appeared] scared and shaken up [and] conversed with Officer Torres in Spanish about the shooting.

While the scene was being processed, Officer Torres gathered more information about Ms. Guzman. Ms. Guzman informed Officer Torres that the victim was her roommate [and that she referred to him] as "Papa." She indicated that she was present in the apartment with the victim and another friend (later identified as Darryl Peterson a/k/a "D Block") who was a dark-skinned black or Hispanic male, wearing blue jean shorts, a blue and white shirt, [Nike] sneakers[,] and donning braids. [The victim]

received a telephone call from an unknown caller and stated, "My boy's coming over." Subsequently, [Appellant] arrived at [the victim's] apartment and [the victim] let [Appellant into the apartment]. The individuals] hung out in the living room area for a few minutes socializing. Thereafter, [the victim] went to the kitchen area where he was soon joined by [Appellant]. [Appellant] ordered [the victim] onto the floor, stated[] "I'm offing you," and shot him in the head.

Then [Appellant] proceeded to the living room area where [Ms. Guzman] and Darryl Peterson were seated. Darryl Peterson struggled with [Appellant] and [Ms.] Guzman fled to her upstairs third floor apartment and exited out of the third floor window onto the roof. [Appellant] chased Darryl Peterson downstairs and out of the apartment, shooting at him with a revolver. [Ms. Guzman] witnessed the shooter exit the apartment, re-enter [the apartment,] and ultimately exit the apartment.

During her initial interview with Detective Gress, [Ms.] Guzman stated that she recognized [Appellant] from the brief encounter that she had with him three [] days earlier when [Mr.] Avila had brought him to [the victim's] apartment to buy drugs. [Ms.] Guzman testified that she was positive that it was the same person. Further[], [Ms.] Guzman described the shooter in her second police interview as a black male, approximately [five-feet, ten-inches] tall, [with a] medium build, bushy hair[,] and bushy beard. Also, at trial, [Ms.] Guzman [testified] that she focused on [Appellant's] eyes. With great conviction, [Ms.] Guzman [testified] that on June 18, 2007, she looked into the eyes of the person who she thought was going to kill her and [testified] that she would never forget those eyes.

Testimony revealed that [Ms.] Guzman unexpectedly met [Mr.] Avila on the street two [] days after the homicide and informed him that the shooter was the person he had brought to [the victim's] apartment to purchase drugs on June 15, 2007. Consequently, a photo array was compiled and shown to [Mr. Avila]. Upon positively identifying [Appellant], the [d]etectives presented the photo array to [Ms.] Guzman. [Ms.] Guzman pointed to [Appellant's] photograph and indicated that he was the person who shot

[the victim]. Subsequent to this identification . . . , the photo array was presented to witness Juan Collazo, an individual who resided near the location of the incident and who saw a person fleeing from the subject residence after the shooting []. [Mr. Collazo] identified [Appellant] as the person he saw running from the doorway of the subject residence on the evening in question.

[On] June 1, 2009, [the jury found Appellant] guilty of [first-degree murder,] attempted homicide, robbery[,] and recklessly endangering another person.[1] [On] July 14, 2009, [the trial court sentenced Appellant to life imprisonment for the murder conviction]. . . .

[On] April 18, 2011, the Superior Court [] affirmed [Appellant's] judgment of sentence [and, on October 17, 2011, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. ***Commonwealth v. Richardson***, 29 A.3d 835 (Pa. Super. 2011) (unpublished memorandum) at 1-20, *appeal denied*, 30 A.3d 488 (Pa. 2011)]. . . .

[On] March 22, 2012, [Appellant] filed a [PCRA petition. Appointed counsel then filed an amended PCRA petition] on May 31, 2012. . . . In [the PCRA petition, Appellant claimed that his trial counsel] rendered ineffective assistance [] by: (1) failing to adequate[ly] investigate and/or call Alan Jenkins and Carissa Clark to testify as alibi witnesses; (2) failing to adequately investigate exculpatory evidence regarding cell phone records of [the victim]; (3) failing to object to Commonwealth witnesses refreshing their recollection through reports written by police officers; (4) failing to object to the hearsay testimony of Officer Torres regarding statements made by Ms. Guzman which were not contained in the police reports; and[,] (5) failing to include in the [Rule] 1925(b) statement issues regarding trial court error in failing to grant a mistrial where improper influences occurred. . . .

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 901(a), 3701(a), and 2705, respectively.

- 4 -

A hearing on [Appellant's PCRA petition] was conducted on June 6, 2012, from which [the PCRA court made] the following findings of fact.[2]  Lehigh County Chief Deputy Public Defender Karen Schular represented [Appellant at trial].  Attorney Schular met with [Appellant] regularly to discuss the case and prepare for trial.  In an effort to be thorough, Attorney Schular investigated all the witnesses and people identified in the discovery material that was furnished to her who potentially supported the defense's theory of the case.  These individuals were investigated by a Lehigh County Public Defender investigator, as well as personally by Attorney Schular on the weekends.

Police interviewed Alan Jenkins, a person that [Appellant] had identified as an alibi witness.  Attorney Schular went through great lengths to locate Alan Jenkins to speak with him.  Ultimately an address in Georgia was [discovered] for Alan Jenkins, and Attorney Schular served a subpoena on him to appear at the time of trial.  Upon receipt of the subpoena, Alan Jenkins contacted Attorney Schular and related to her that he hardly knows [Appellant] and that he did not know anything about the incident.  Alan Jenkins was belligerent and [antagonistic] on the [telephone] with Attorney Schular, and clearly conveyed that he wanted no involvement in the case.  Attorney Schular believed that it was too dangerous and risky to utilize him as an alibi witness, and discussed [the] same on multiple occasions with [Appellant].

[Attorney Schular also] spoke with Carissa Clark, [Appellant's] ex-girlfriend[,] in April of 2008, with regard to [Appellant's] whereabouts on the night of the murder.  Carissa Clark [initially indicated] that she and [Appellant] had been on [her] porch [at the time of the shooting] and then had gone to bed together [].  This information was sufficient to allow Attorney Schular to file a notice of alibi.

_____

[2] Unfortunately, the court reporter lost the tapes that contained the testimony from the June 6, 2012 PCRA hearing.  Therefore, on November 13, 2013, the parties appeared before the PCRA court and attempted to recreate the June 6, 2012 transcript.  **See** N.T. Recreation Hearing, 11/13/13, at 1-43.

- 5 -

However, Carissa Clark was subsequently interviewed by Detective Vazquez. [Carissa Clark told Detective Vazquez] that she did not specifically recall the evening of the murder, but she could relate to him what she and [Appellant] routinely did each day. In light of this inconsistent testimony provided by Carissa Clark, Attorney Schular spoke with Carissa Clark again concerning the issue of alibi. Carissa Clark reiterated her statement that she had given to Detective Vazquez and informed Attorney Schular that she could only provide a general context of their typical evening routine, but [that she] did not have any specific recollection of the subject evening. Additionally, Attorney Schular noted that when Carissa Clark became upset, she developed an attitude that [Attorney Schular] felt would not be received well by the jury. Based on the foregoing, Attorney Schular believed that it would be a poor decision to have Carissa Clark testify at the time of trial and be subject to cross-examination.

In addition to investigating people, Attorney Schular investigated the cell phone records of [the victim] that were produced to her prior to trial. Attorney Schular was aware that there was a direct connect at 9:36 [p.m.] to the victim's cell phone from a "Jeremy." Additionally, Attorney Schular investigated this information and it was determined that this number belonged to an individual named Lewis Brown who resided in Georgia. At the time of trial, during cross-examination, Attorney Schular extensively attacked Detective Gress's investigation into the cell phone records and specifically argued that the investigation was lacking concerning identifying the true identity of "Jeremy."

During the trial, Officer Torres testified that Ms. Guzman stated that she had recognized [Appellant] because she had seen him three [] days prior to the murder []. This statement was not contained in Officer Torres' police report. Nonetheless, Attorney Schular did not object to its admission. Indeed, Attorney Schular made the tactical decision not to object because she wanted other statements made by Ms. Guzman to be admitted, which dealt with her initial description of the perpetrator. Initially Ms. Guzman had described the shooter as having bushy hair and a bushy beard. This description was inconsistent with [Appellant's] appearance and the other witnesses' testimony, and

- 6 -

[Attorney Schular] believed that it was imperative to get this information before the jury for consideration. Also, Attorney Schular thoroughly cross-examined Officer Torres on this issue, indicating that his report was extremely detailed, yet failed to include this seemingly vital piece of information.

Finally, during the appeal process, Attorney Schular filed a [Pennsylvania Rule of Appellate Procedure 1925(b)] statement[,] which included numerous allegations of error committed by [the trial court], including [the trial court's alleged] error in failing to grant a mistrial based on a "trial by transcript" and the length of the [jury] deliberations. Attorney Schular also included in her appellate brief the ancillary issues of the jury foreperson doing her own [Spanish to English] translations and an incident in which someone [said] "Guilty, guilty, guilty," as the jurors were being escorted to their vehicles at the end of the evening. Attorney Schular included these ancillary issues in her brief only to provide the Superior Court [] with a complete overview of the case, knowing that there was no merit to the issues in and of themselves. As a seasoned defense attorney, Attorney Schular was aware that the best strategy in filing an appeal is to be concise with regard to the primary potentially meritorious arguments, and not to dilute them by including other flawed issues. Consequently, only two [] subsections were included in the [Rule] 1925(b) statement with regard to [the trial court's] alleged failure to grant a mistrial.

PCRA Court Opinion, 7/13/12, at 1-9 (internal footnotes omitted) (some internal capitalization omitted).

The PCRA court denied Appellant's PCRA petition on July 13, 2012 and Appellant filed a timely notice of appeal. After reviewing the record, however, PCRA counsel determined that the appeal had no merit. As a result, PCRA counsel notified Appellant that he intended to withdraw from representation and PCRA counsel filed, in this Court, both a petition to withdraw as counsel and an accompanying "no merit" brief pursuant to

*Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988) and *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. 1988) (*en banc*). *See Commonwealth v. Wrecks*, 931 A.2d 717, 721 (Pa. Super. 2007) (to comply with *Turner*/*Finley*, counsel must either "submit a 'no-merit' letter to the trial court[] or [a] brief on appeal to this Court"). Appellant now raises the following claims on appeal:

> 1. [Trial c]ounsel was ineffective for failing to adequately investigate and/or call to testify the alibi witnesses, Carissa Clark and Alan Jenkins[.]
>
> 2. [Trial c]ounsel was ineffective for failing to adequately investigate exculpatory evidence regarding the cell phone records of [the victim.]
>
> 3. [Trial c]ounsel was ineffective for failing to object to the hearsay testimony of Officer Torres regarding statements made by Ms. Guzman which were not contained in the police reports[.]
>
> 4. [Trial c]ounsel was ineffective for failing to include issues regarding trial court error in failing to grant a mistrial where improper influences occurred in the [Rule] 1925(b) statement, thereby waiving that issue on appeal.

Appellant's Brief at 2.

Before reviewing the merits of this appeal, however, this Court must first determine whether counsel has fulfilled the necessary procedural requirements for withdrawing as counsel. *Commonwealth v. Daniels*, 947 A.2d 795, 797 (Pa. Super. 2008).

As we have explained:

> Counsel petitioning to withdraw from PCRA representation must proceed . . . under [*Turner*/*Finley*. Under]

> *Turner*/*Finley*[,] counsel must review the case zealously. *Turner*/*Finley* counsel must then submit a "no-merit" letter to the trial court, or brief on appeal to this Court, detailing the nature and extent of counsel's diligent review of the case, listing the issues which the petitioner wants to have reviewed, explaining why and how those issues lack merit, and requesting permission to withdraw.
>
> Counsel must also send to the petitioner: (1) a copy of the "no-merit" letter/brief; (2) a copy of counsel's petition to withdraw; and (3) a statement advising petitioner of the right to proceed *pro se* or by new counsel.
>
> . . .
>
> [W]here counsel submits a petition and no-merit letter that do satisfy the technical demands of *Turner*/*Finley*, the court – trial court or this Court – must then conduct its own review of the merits of the case. If the court agrees with counsel that the claims are without merit, the court will permit counsel to withdraw and deny relief.

*Wrecks*, 931 A.2d at 721 (internal citations omitted).

Here, counsel has satisfied all of the above procedural requirements. We will, therefore, "conduct [our] own review of the merits of the case" and determine whether the claims are in fact meritless. *Id.*

We have stated:

> This Court's standard of review regarding an order dismissing a petition under the PCRA is whether the determination of the PCRA court is supported by evidence of record and is free of legal error. In evaluating a PCRA court's decision, our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level. We may affirm a PCRA court's decision on any grounds if it is supported by the record.

*Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010) (internal citations omitted).

To be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from "one or more" of the seven, specifically enumerated circumstances listed in 42 Pa.C.S.A. § 9543(a)(2). One of these statutorily enumerated circumstances is the "[i]neffectiveness of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii).

Counsel is, however, presumed to be effective and "the burden of demonstrating ineffectiveness rests on [A]ppellant." *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010). To satisfy this burden, Appellant must plead and prove by a preponderance of the evidence that:

> (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different.

*Commonwealth v. Fulton*, 830 A.2d 567, 572 (Pa. 2003). "A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim." *Id.* Further, with respect to the second ineffectiveness prong, we note that an attorney's "chosen strategy will not be found to have lacked a reasonable basis unless it is proven that an alternative not chosen offered a

potential for success substantially greater than the course actually pursued."

***Commonwealth v. Cox***, 983 A.2d 666, 678 (Pa. 2009) (internal quotations omitted).

Appellant first claims that trial counsel was ineffective for "failing to adequately investigate and/or call to testify the alibi witnesses, Carissa Clark and Alan Jenkins." This claim is meritless.

Our Supreme Court has explained:

> Generally, an alibi is a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party. At the core of an alibi defense is, of course, consistency between the date and time of the crime and that of the defendant's alibi.

***Commonwealth v. Ali***, 10 A.3d 282, 316 (Pa. 2010) (internal citations, quotations, and corrections omitted).

Further:

> In order to prevail on a claim of ineffectiveness for failing to call a witness, a [petitioner] must [plead and] prove, in addition to . . . the three [general ineffective assistance of counsel] requirements [listed above], that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew or should have known of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the witness's testimony was so prejudicial as to have denied [the petitioner] a fair trial.

***Commonwealth v. Wright***, 961 A.2d 119, 155 (Pa. 2008).

During the PCRA hearing, Appellant's trial counsel – Attorney Schular – testified that she investigated Appellant's alleged "alibi" prior to trial and,

- 11 -

during the course of this investigation, Attorney Schular interviewed both Alan Jenkins and Carissa Clark. However, Attorney Schular testified that neither Alan Jenkins nor Carissa Clark were able to "place[ Appellant] at the relevant time in a different place than the scene involved." *Ali*, 10 A.3d at 316. Certainly, Attorney Schular testified that Alan Jenkins declared that "he hardly knew [Appellant] and knew nothing about th[e] incident" and that Carissa Clark declared that "she did not have a specific recollection of the subject evening" and that she could only testify as to "what their usual practice was." N.T. Recreation Hearing, 11/13/13, at 28-29.

Therefore, since neither Alan Jenkins nor Carissa Clark was able to "place[ Appellant] at the relevant time in a different place than the scene involved," neither individual would have been able to provide Appellant with an alibi defense at trial. Appellant's first claim on appeal is thus meritless.

Next, Appellant claims that his trial counsel was ineffective "for failing to adequately investigate exculpatory evidence regarding the cell phone records of [the victim]." According to Appellant, had trial counsel investigated the victim's cell phone, trial counsel would have learned "that a 'Luis Brown' of Georgia had 'direct connects' with the victim around the time of the murder." Appellant's Brief at 4.

The PCRA court explained why this issue is meritless:

> [Appellant's] argument [on this issue] . . . is factually contradicted by the record. Attorney Schular investigated the cell phone records of [the victim] that were produced [] by the Commonwealth prior to trial. Attorney Schular was

- 12 -

> aware of the fact that there was a direct connect at 9:36 [p.m.] to the victim's cell phone from a "Jeremy." This information was consistent with the defense's theory of the case. Additionally, Attorney Schular investigated this information and it was determined that the subscriber information belonged to a Lewis Brown from Georgia. Attorney Schular ran the criminal histories of "Lewis Brown" in Georgia, and she unfortunately determined that many of the individuals named Lewis Brown from Georgia were incarcerated at the time of the homicide. Also, at the time of trial, during cross-examination, Attorney Schular extensively attacked Detective Gress's investigation into the cell phone records and specifically argued that his investigation was lacking with regard to determining the true identity of "Jeremy."

PCRA Court Opinion, 7/13/12, at 12-13.

Therefore, Appellant's claim on appeal – that his trial counsel was ineffective "for failing to adequately investigate exculpatory evidence regarding the cell phone records of [the victim]" – fails, as the claim has no basis in fact.

Third, Appellant claims that his trial counsel was ineffective "for failing to object to the hearsay testimony of Officer Torres regarding statements made by Ms. Guzman which were not contained in the police reports." Appellant's Brief at 2. Again, the PCRA court has thoroughly explained why this claim lacks merit:

> During the trial, Officer Torres testified that Ms. Guzman stated that she had recognized [Appellant] because she had seen him three [] days prior to the murder []. This statement was not contained in Officer Torres' police report. Nonetheless, Attorney Schular did not object to its admission. Indeed, Attorney Schular made the tactical decision not to object because she wanted other statements made by Ms. Guzman to be admitted, which dealt with her initial description of the perpetrator. Initially Ms. Guzman

- 13 -

had described the shooter as having bushy hair and a bushy beard. This description was inconsistent with [Appellant's] appearance and the other witnesses' testimony, and [Attorney Schular] believed that it was imperative to get this information before the jury for consideration. Also, Attorney Schular thoroughly cross-examined Officer Torres on this issue, indicating that his report was extremely detailed, yet failed to include this seemingly vital piece of information. Accordingly, [the PCRA court concluded] that [] Attorney Schular's aforementioned actions and/or inactions were reasonably based and supported her client's defense.

PCRA Court Opinion, 7/13/12, at 12-13.

The PCRA court thus concluded that Attorney Schular's failure to object to Officer Torres' hearsay testimony was a valid, reasonable trial strategy and that Appellant was not able to prove that an alternative strategy "offered a potential for success substantially greater than the course actually pursued." **Cox**, 983 A.2d at 678. The PCRA court's factual determination was supported by the evidence and does not constitute an abuse of discretion. Thus, Appellant's claim fails.

Finally, Appellant claims that Attorney Schular was ineffective for "failing to include issues regarding trial court error in failing to grant a mistrial where improper influences occurred in the [Rule] 1925(b) statement, thereby waiving that issue on appeal." Appellant's Brief at 2. As explained above, these alleged "improper influences" occurred: when, at the jury's request, portions of the trial testimony were re-read to the jury during deliberations and when some unidentified individual declared "guilty, guilty, guilty" in the presence of some of the jurors.

Appellant's ineffective assistance of counsel claim fails because the underlying claims have no merit. With respect to the re-reading of testimony, we have held: "[w]hen a jury requests that recorded testimony be read to it to refresh its memory, it rests within the trial court's discretion to grant or deny such request . . . so long as there is not a flagrant abuse of discretion, this decision should not be overturned on appeal." *Commonwealth v. Gladden*, 665 A.2d 1201, 1205 (Pa. Super. 1995) (*en banc*) (internal quotations and citations omitted).

On Appellant's direct appeal, the trial court explained:

> While it is true that the jury requested a great deal of testimony [be] read back to them during their deliberations, the questions and testimony that the members of the jury sought were not duplicative or repetitive in nature. Instead, it absolutely appeared to [the trial] court that the jury was progressing and advancing in its deliberation."

Trial Court Opinion, 12/15/09, at 26.

In this case, the trial court did not abuse its discretion when it re-read portions of the trial testimony during the jury's deliberations. To be sure, Appellant's trial occurred over 12 days and, during this time, the Commonwealth called 14 witnesses. Further, the charges against Appellant were extraordinarily serious and required very careful deliberation by the fact-finders. As such, it was reasonable for the jury to request – and for the trial court to allow – portions of the trial testimony to be re-read to the jury during deliberations. The trial court thus did not err when it refused to grant a mistrial based upon the re-reading of the trial testimony and this Court

would not have granted Appellant relief on this claim on direct appeal. Therefore, to the extent Appellant's ineffective assistance of counsel challenge is based upon this underlying claim, the challenge fails.

Appellant also claims that his counsel was ineffective for failing to preserve, on direct review, the claim that the trial court erred in failing to grant a mistrial when some unidentified individual said "guilty, guilty, guilty" in the presence of the jurors. The underlying claim is meritless.

On May 26, 2009, in the midst of Appellant's trial, the trial court held a hearing on an event that occurred outside of court. During this hearing, the trial court heard testimony from Deputy Sheriff Sue Schiavone. Deputy Schiavone testified:

> When the jurors were coming out of the courthouse, there was maybe two jurors that were still left that were coming out of the door, and there was a man standing smoking, and as they were coming out he said "guilty," "guilty," "guilty." I said to him, "you need to be quiet. You can go to jail for that." He apologized, said he didn't know. I said, "well you know now." So he stopped and we continued on.

N.T. Trial, 5/26/09, at 128.

Moreover, with respect to the unidentified man's statement, Deputy Schiavone testified that the jurors "didn't even act like they heard anything. They were talking amongst each other, so I honestly can't say what they heard or they didn't . . . [but t]hey didn't look. They didn't turn around. They didn't react at all." *Id.* at 132.

- 16 -

Appellant moved for a mistrial. However, the trial court credited Deputy Schiavone's testimony and denied Appellant's request for a mistrial.

It is clear that, had Appellant preserved any claim related to the trial court's failure to grant a mistrial on direct appeal, that claim would have failed. As we have held:

> Granting a mistrial is an extreme remedy, and we defer to the trial court's discretion on the matter. A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial.

*Commonwealth v. King*, 959 A.2d 405, 418 (Pa. Super. 2008) (internal quotations and citations omitted).

In denying Appellant's motion for a mistrial, the trial court credited Deputy Schiavone's testimony and concluded that the jury did not even hear the individual make the prejudicial remark. This factual finding is supported by the record. Therefore, in this case, Appellant's counsel was not ineffective for failing to preserve the underlying claim on direct appeal, as the underlying claim has no arguable merit. Appellant's claim fails.

We have independently conducted our own review of this case and we agree with appointed counsel that the current appeal has no merit. Thus, we grant counsel's motion to withdraw and affirm the order denying Appellant relief under the PCRA.

Motion to withdraw as counsel granted. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/26/2014