J-A02022-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TYRONE JOHNSTON | |
| Appellant | No. 2929 EDA 2013 |

Appeal from the Judgment of Sentence of March 4, 2009
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0004489-2007

BEFORE:  PANELLA, J., LAZARUS, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                    **FILED MARCH 20, 2015**

Tyrone Johnston appeals *nunc pro tunc* from the judgment of sentence entered on March 4, 2009, following reinstatement of his appeal rights by order of October 4, 2013, pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46.  Johnston challenges his bench trial convictions of two counts of first-degree murder, criminal conspiracy, and two counts of possessing instruments of crime ("PIC").[1]  We affirm.

The PCRA court set forth the underlying facts as follows:

On February 7, 2006, [Jamel] Conner was shot and killed on the 2800 block of Kensington Avenue in North Philadelphia.  Conner was shot six times at close range—twice in the head and once each in the chest, right shoulder, left shoulder, and right middle finger.  All shots were fired within a distance of [two to three] feet.  Conner was taken to Temple University Hospital where, at

---

[1]    18 Pa.C.S.A. §§ 2502(a), 903, and 907(a), respectively.

3:04 AM, he was pronounced dead. Five shell casings from a .9 millimeter gun were recovered from the scene.

The circumstances surrounding Conner's death did not become fully known until a subsequent shooting occurred three months later in the same neighborhood. In the early morning of May 15, 2006, 24-year-old [Stephanie] Labance was shot at 2933 Ruth Street in North Philadelphia. She was pronounced dead on the scene at 4:19 AM as a result of two close-range gunshot wounds to the head. Two shell casings from a .9 millimeter gun were recovered from the scene.

On June 5, 2006, during a routine patrol of Kensington Avenue,[8] Philadelphia Police Officer Anna Mae Law stopped Erin Wood (Wood) at 2:45 AM. Officer Law told Wood to leave the area because a young woman, Labance, had recently been killed in the area. When Wood told Officer Law that she had information about the shooting, she was taken to the Homicide Unit to make a statement, where she related the following:

[8] This area was known for prostitution.

During a conversation [Johnston] had with Wood and her boyfriend, Paul Evans (Evans), a few weeks before the murder, [Johnston] had stated that he had given drugs to Labance to sell on his behalf. "[S]he was supposed to turn in 200 and some dollars, never turned it in and was gone for a few days." Labance resurfaced; [Johnston] found her and took her to the street, where his associate, Horace Archer—referred to as "Jay" (Jay)—joined [Johnston] and Labance. Jay handed a gun to [Johnston], who said that he had no choice but to shoot Labance. [Johnston] bragged to Wood and Evans that he shot the girl on Ruth Street.

Wood also linked [Johnston] to a February 2006 shooting, blocks away from where Labance had been killed.[9] As of February 2006, Wood had known [Johnston] for two years, as he had dealt drugs to her. On February 27, 2006, Wood had been in the area of 2840 Kensington Avenue when [Johnston] walked towards Conner and the two exchanged words. Wood watched as, roughly five seconds after [Johnston] and Conner started speaking, [Johnston] pulled a gun from his waistband and shot Conner in the chest; once Conner collapsed, [Johnston] stood over him and fired two or three more times. [Johnston] then sprinted away from the scene of the shooting, down Kensington Avenue. At one point, he came within 10-12 feet of Wood,

whereupon she saw his face. She then saw [Johnston] enter Jay's parked car, which then drove off. When Wood spoke with Officer Law, she mentioned that another woman, Mary Beth Beiland (Beiland), had also been in the area of 2840 Kensington Avenue when Connor was shot.

[9] Ballistics testing revealed that fire[d] cartridge casings (FCCs) found outside Conner's home, 2840 Kensington Avenue, had been fired from the same firearm that was used to kill Labance.

Beiland testified that she had been purchasing crack cocaine from [Johnston] for about three years prior to the time of Conner's murder. Beiland spent a significant amount of time with [Johnston] and Jay, who supplied [Johnston] with crack cocaine to sell. During that time, Beiland became acquainted with both Labance and Conner, both of whom used drugs obtained from Jay.

On February 27, 2006, Beiland entered Jay's building and found [Johnston] and Jay confronting Conner about selling "fake crack." In fact, Beiland had purchased "fake crack" from Conner a few days earlier. The argument escalated; Conner threatened to set fire to Jay's car and house.

ADA BARRY: During the course of this argument did you hear Tyrone Johnston say anything?

MS. BEILAND: Yeah. He said not to worry about it, tell Jay don't worry about it, that he'll take care of it.

Immediately after threatening [Johnston], Conner left the premises as [Johnston], Jay[,] and Beiland went upstairs in the building to Jay's apartment. [Johnston] and Jay spoke to one another in the hallway; Beiland entered the apartment and sat close to the window, watching as Jay walked back out of the building to his car. "He got in his car and made a u-turn." At some point thereafter, Beiland saw [Johnston] exit the apartment building and walk directly to Conner, who was standing near a nail salon. Beiland then heard a gunshot and saw [Johnston] standing over Conner, who had collapsed onto the ground. Next, [Johnston] took off towards Somerset Street and entered Jay's car, which drove off.

Although they could not identify [Johnston] as the shooter, eyewitnesses George Filosoglou (Filosoglou), Richard Lacovara

- 3 -

(Lacovara), and Charles Purnell (Purnell) corroborated the essential facts of the shooting. Filosoglou was on Kensington Avenue when he heard gunshots. He turned toward the sound and saw a man run to a red car, get in, and saw the car drive off. Lacovara happened to be driving a news van at that location when he heard a popping sound, turned and saw one man standing over another man, with one arm held down lover than the other. Purnell was a passenger in the news can with Lacovara. He heard loud pops, turned his attention toward them, and saw a man firing his weapon four to five times at another man who was on the ground; Purnell then saw the shooter run away. . . .[10]

[10] Dr. Gary Collins testified that the cause of Conner's death was multiple gunshot wounds. Conner suffered six gunshot wounds, including two to the head and one to the chest. Each gunshot was inflicted from close range—two to three feet away. Because the head wounds would have caused instant immobility, at least one shot must have been fired after Conner had lost the ability to voluntarily move [*sic*].

PCRA Court Opinion ("P.C.O."), 4/28/2014, at 3-6 (record citations and some footnotes omitted).

On February 26, 2009, following a non-jury trial . . . , [Johnston] was found guilty of [the above-mentioned counts].[1] Sentencing was deferred until March 4, 2009, on which date [the c]ourt sentenced [Johnston] to the mandatory term of life imprisonment[2] for both counts of murder of the first degree.[3] On March 12, 2009, [Johnston] filed post-sentence motions, which [the c]ourt denied on July 8, 2009.

[1] In connection with the killing of Jamel Conner (Conner), CP-51-CR-0004489-2007, [Johnston] was convicted of murder of the first degree, criminal conspiracy, and PIC. In connection with the killing of Stephanie Labance (Labance), CP-51-CR-1300475-2006, [Johnston] was convicted of murder of the first degree and PIC. [Johnston] was represented by Steven Laver, Esquire on the Conner case, and by Bernard Siegel, Esquire, on the Labance case.

[2] 18 Pa.C.S.A. § 1102(a)(1).

- 4 -

[3] As to the conviction for criminal conspiracy in connection with the Conner murder, [Johnston] was sentenced to a consecutive term of not less than 20 nor more than 40 years['] imprisonment. As to the conviction for PIC in connection with the Conner murder, [Johnston] was sentenced to a consecutive term of not less than two-and-a-half years nor more than five years['] imprisonment. As to the conviction for murder of the first degree in connection with the Labance murder, [Johnston] was sentenced to a consecutive term of life imprisonment. And finally, as to the conviction for PIC in connection with the Labance murder, [Johnston] was sentenced to a consecutive term of not less than two-and-a-half nor more than five years['] imprisonment.

On July 20, 2009, [Johnston] filed a timely notice of appeal as to both cases.[4] On December 9, 2009, [the trial c]ourt filed an opinion pursuant to Pa.R.A.P. 1925(a) . . . .[5] Thereafter, [Johnston's] counsel failed to comply with the briefing schedule as set forth by the Superior Court. On June 17, 2010, the Superior Court dismissed the appeal arising out of the Labance murder. On July 13, 2010, the Superior Court dismissed the appeal arising out of the Conner murder. [Johnston's] counsel petitioned the Superior Court to reinstate both appeals. On July 14, 2010, the Superior Court reinstated the appeal arising out of the Labance murder; on August 11, 2010, the Superior Court reinstated the appeal arising out of the Conner murder. [Johnston's] counsel submitted briefs in connection with the Labance appeal, allowing that case to progress forward; on March 20, 2011, the Superior Court affirmed [Johnston's] judgments of sentence on that case. On April 11, 2011, [Johnston] petitioned our Supreme Court for allowance of appeal, which was denied on September 20, 2011.

[4] The Superior Court docket number assigned to the case associated with the Conner murder was 2105 EDA 2009. The Superior Court docket number assigned to the case associated with the Labance murder was 2116 EDA 2009.

[5] This [Pa.R.A.P.] 1925(a) Opinion addressed issues raised with respect to both the Conner and Labance appeals—2105 EDA 2009 and 2116 EDA 2009.

Whereas the Labance appeal reached our Commonwealth's appellate courts on its merits, the Conner appeal was again

- 5 -

dismissed by the Superior Court on September 22, 2010 for counsel's failure to file a brief. On November 22, 2010, [Johnston] filed a *pro se* petition pursuant to the [PCRA] seeking reinstatement of his direct appeal rights on the Conner case. Due to an administrative error, the Clerk of Courts failed to appoint an attorney to represent [Johnston] on collateral attack for more than two years.[7] On July 31, 2013, in response to an inquiry in that Court by [Johnston], our Supreme Court issued an order, directing [the PCRA c]ourt to resolve [Johnston's] pending PCRA petition within 90 days of the date of the order. On August 6, 2013, John P. Cotter, Esquire, having been appointed, entered his appearance on [Johnston's] behalf. On September 3, 2013, he filed an amended petition, to which the Commonwealth responded on September 27, 2013. In his amended petition, [Johnston] raised two issues: (1) [Johnston] requested reinstatement of [his] direct appeal rights on the Conner case, and (2) [Johnston] claimed that [his] trial counsel was ineffective for failing to litigate a speedy trial motion on the Labance case. On October 4, 2013, without objection from the Commonwealth, [the PCRA c]ourt reinstated [Johnston's] appellate rights on the Conner case *nunc pro tunc*. On November 25, 2013, [the PCRA c]ourt held an evidentiary hearing pursuant to Pa.R.Crim.P. 908 . . . to address [Johnston's] claim that trial counsel was ineffective for failing to litigate a speedy trial motion on the Labance case. At the conclusion of the [Rule] 908 Hearing, [the PCRA c]ourt denied at dismissed [Johnston's] petition.

> [7] Ordinarily, the Clerk of Courts receives PCRA petitions and alerts chambers when a new PCRA petition has been filed. In this situation, [the PCRA c]ourt first became aware that [Johnston] had filed his November 22, 2010 petition upon receiving our Supreme Court's July 31, 2013 order.

*Id.* at 1-3 (record citations omitted). Accordingly, the instant appeal arises

*nunc pro tunc* from Johnston's convictions under the Conner case.[2]

---

[2] Johnston filed a separate appeal from the denial of his PCRA petition, which we address at Docket No. 3271 EDA 2013.

In the instant appeal *nunc pro tunc* from his judgment of sentence, Johnston raises three questions for our review:

> I.    Was the evidence insufficient to convict [Johnston] of [first-]degree murder, conspiracy, and possession of instrument of a crime [*sic*] (PIC)?
>
> II.    Did the trial court err in allowing consolidation of two wholly separate homicide cases into one trial?
>
> III.   Was [Johnston] denied his Constitutional right to confrontation when the trial court permitted the testimony of Assistant Medical Examiner Dr. Gary Collins as to the cause and manner of death even though Dr. Collins was not the pathologist who conducted the autopsy of the victim and was not even present when the autopsy was done?

Johnston's Brief at 2.

In his first issue, Johnston contests the sufficiency of the evidence underlying his convictions for first-degree murder, conspiracy, and PIC. Specifically, he argues that "eye-witness testimony that [Johnston] was the perpetrator of these offenses was inconsistent, contradictory, and unreliable and there was no physical evidence that connected [Johnston] to the offenses and three eyewitnesses to the incident who were not cocaine users or under the influence of drugs did not identify [Johnston] a[s] the perpetrator of the offenses." *Id.* at 6. We disagree.

> In evaluating a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. We may not weight the evidence and substitute our judgment for the fact-finder. To sustain a conviction, however, the facts and circumstances which

- 7 -

the Commonwealth must prove must be such that every essential element of the crime is established beyond a reasonable doubt.

Lastly, the finder of fact may believe all, some or none of a witness's testimony.

*Commonwealth v. Priest*, 18 A.3d 1235, 1239 (Pa. Super. 2011) (citations omitted). A factfinder's acceptance of some, but not all, testimony does not render the evidence insufficient. *Priest*, 18 A.3d at 1240. Any uncertainty in an eyewitness's identification of a defendant is a question of the weight of the evidence, not its sufficiency. *See Commonwealth v. Minnis*, 458 A.2d 231, 233 (Pa. Super. 1983).

Here, Erin Wood testified that, before Jamel Conner's death, she had known Johnston for two years as her drug dealer, and Jamel Conner for a year and a half as a fellow drug user. *See* Notes of Testimony ("N.T."), 2/23/2009, at 154, 161. In the early morning hours of February 7, 2006, Wood was standing on the sidewalk on Frankford Avenue when she saw Johnston walking toward Conner and a man she knew as "Paul." *Id.* at 165. She watched Johnston exchange words with Conner, pull a gun from his pants, and shoot Conner in the chest. *Id.* at 166, 170-72. She further testified that she watched Conner fall to the ground, and that Johnston "stood over top of him and shot him again." *Id.* at 172. She crossed the street as she saw Johnston run over to Jay's car, and estimated that Johnston passed within ten to twelve feet of her. *Id.* at 173-74. She testified:

[ADA Barry]:   Were you able to see his face?

[Wood]:   Yes.

[ADA Barry]:   Did you have any doubt that it was Johnston?

[Wood]:   No.

*Id.* at 174.

Conner's murder also was witnessed by Mary Beth Beiland, who was familiar with Johnston and Conner. N.T., 2/25/2009, at 72-73. She watched Johnston from Jay's apartment as Johnston approached Conner on the street. *Id.* at 95-96. She testified that she heard a gunshot and saw Johnston standing over Conner, and watched him leave the scene in Jay's car. *Id.* at 99. Dr. Gary Collins testified, consistent with this description of events, that Conner died of six gunshot wounds inflicted from close range. *Id.* at 162-71.

Johnston contends that there was insufficient evidence to convict him of the offenses related to Conner's murder because "no weapon was found on [Johnston] that linked him to the offenses" and "[t]he two eyewitnesses that identified [Johnston] were both admitted long[-]term crack cocaine users whose testimony was contradictory, inconsistent[,] and unreliable." Johnston's Brief at 7.

However, we frequently have held that identification testimony by eyewitnesses is sufficient to support a conviction. ***See, e.g.***, ***Commonwealth v. Brooker***, 103 A.3d 325, 330 (Pa. Super. 2014) ("Pennsylvania courts have consistently held that [eyewitness testimony] is

sufficient for a first-degree murder conviction."); *Commonwealth v. King*, 959 A.2d 405, 411 (Pa. Super. 2008) ("The identification testimony of the two eyewitnesses was sufficient to support Appellant's conviction."). Furthermore, Johnston's challenge to the credibility of Wood and Beiland's testimony goes to its weight, not its sufficiency, and we will not usurp the role of the trial court as fact-finder by reweighing the evidence. *See Priest*, 18 A.3d at 1239; *Minnis*, 458 A.2d at 233. Johnston's first issue does not merit relief.

In his second issue, Johnston challenges the consolidation of the cases for the homicides of Jamel Conner and Stephanie Labance because "the trial court made the erroneous finding that the evidence of each murder charge could be used as evidence of the other murder charge and therefore the finding of guilt was based on irrelevant and highly prejudicial evidence." Johnston's Brief at 8. We disagree, and conclude that, because a previous panel of this Court has reviewed this issue, we are bound by the law of the case.

Pennsylvania Rule of Criminal Procedure 582 provides, in relevant part:

> **Rule 582.   Joinder—Trial of Separate Indictments or Informations**
>
> (A) Standards
>
> (1)  Offenses charged in separate indictments or informations may be tried together if:

> (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion[.]

Pa.R.Crim.P. 582(A)(1)(a). "Whether or not separate indictments should be consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." *Commonwealth v. Robinson*, 864 A.2d 460, 481 (Pa. 2004) (citation omitted).

Here, Johnston argues that he was prejudiced by the joinder of "two separate and unrelated murders." Johnston's Brief at 9. He does not address the PCRA court's observation that this precise issue has already been considered and ruled upon by this Court. P.C.O. at 9. "Under the doctrine of 'law of the case,' where an appellate court has considered and decided a question on appeal, that Court will not, in a subsequent appeal of another phase of the same case, reverse its previous ruling." *Commonwealth v. Warrick*, 609 A.2d 576, 578 n.3 (Pa. Super. 1992) (citation omitted).

Previously, a panel of this Court reviewed Johnston's appeal from the judgment of sentence entered on March 4, 2009, for the murder of Stephanie Labance, in which Johnston challenged "whether the court erred in consolidating for trial [Johnston's] charges in this case[, the Labance charges,] with a homicide charge in another case[, the Conner charges]." *Commonwealth v. Johnston*, No. 2116 EDA 2009, unpublished

memorandum at 1 (Pa. Super. March 30, 2011). There, after setting forth

our standard of review, as above, the Court held:

> [Johnston] argues the trial court erred when it allowed the [homicide of Stephanie Labance] to be consolidated for trial with charges listed in a separate criminal information alleging the homicide of Jamel Connor. There is no merit to [Johnston's] argument.
>
> *       *       *
>
> Ballistics evidence indicated the gun used to kill L[a]bance was the same one used by the person who killed Connor. Beiland and Wood saw [Johnston] shoot Connor. Testimony from Beiland indicated [Johnston] and his drugselling associate, Jay, had an argument with Connor over the sale of drugs, and that the killing sprang from that drug dispute. [Johnston's] own statements, elicited at trial from Wood, indicated that L[a]bance was likewise killed because of a dispute involving drug sales. Moreover, testimony linked Jay to the killing of L[a]bance in that Jay told [Johnston] to do what he had to do after [Johnston] located L[a]bance.
>
> The trial court reasoned that the foregoing evidence was relevant and admissible as to each homicide charge because the evidence tended to prove the identity of the shooter in each case. In reaching this decision, the court also reasoned that, because this case was a bench trial, the risks of factfinder confusion and misuse of the evidence were non-existent.
>
> We see no abuse of discretion in the foregoing evidentiary determination. The common weapon, the similar drug- or money-related motive, and the involvement of Jay in each case helped to establish the identity of the shooter in the other case. Also, we presume the trial court, as factfinder, followed the law and used the evidence for appropriate reasons.
>
> Similarly, we find no abuse in the court's ultimate determination to consolidate the informations. The distinct homicides, while involving evidence both relevant and admissible as to each other, were easily separable for the purposes of determining guilt. The facts were relatively straightforward; we find no reason to conclude the court was confused as to which case was

- 12 -

which. [Johnston's] claim that it was error to consolidate the cases warrants no relief.

*Johnston*, No. 2116 EDA 2009, at 7-8. We will not reverse the previous ruling, in which this Court determined that there was no trial court abuse of discretion in consolidating the trials for the homicides of Stephanie Labance and Jamel Conner. *See Warrick*, 609 A.2d at 578 n.3. Johnston's second issue does not merit relief.

In his third issue, Johnston contends that the court violated his right to confrontation "when the trial court erroneously permitted the testimony of Assistant Medical Examiner Dr. Gary Collins as to the cause and manner of death" because "Dr. Collins was not the pathologist who conducted the autopsy of the victim, was not even present when the autopsy was done and the [d]octor who did the autopsy was available to testify and was never previously examined by the defense counsel." Johnston's Brief at 10. We disagree, and again conclude that we are bound by the law of the case.

Whether the admission of Dr. Collins' testimony violated Johnston's rights under the Confrontation Clause is a question of law, for which our standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Cannon*, 22 A.3d 210, 217 (Pa. 2011).

> The Confrontation Clause of the Sixth Amendment, made applicable to the States via the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." In *Crawford* [*v. Washington*], 541 U.S. [36,] 51 [(2004)], the Court held that the Sixth Amendment guarantees a defendant's right to confront those "who 'bear testimony'" against him, and defined "testimony" as "[a] solemn declaration or affirmation

- 13 -

made for the purpose of establishing or proving some fact." The Confrontation Clause, the High Court explained, prohibits out-of-court testimonial statements by a witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination.

***Commonwealth v. Yohe***, 79 A.3d 520, 530-531 (Pa. 2013) (some citations omitted).

Our Supreme Court has held that "a medical expert who did not perform the autopsy may testify as to cause of death as long as the testifying expert is qualified and sufficiently informed[.]" ***Commonwealth v. Ali***, 10 A.3d 282, 306 (Pa. 2010). We have concluded that, where the individual who performed the autopsy is unavailable to testify, a qualified testifying expert is one whose "testimony was based upon his own conclusions after his own independent review of the file." ***Commonwealth v. Buford***, 101 A.3d 1182, 1198 (Pa. Super. 2014).

As in Johnston's second issue, we are compelled to follow the law of the case. ***See Warrick***, 609 A.2d at 578 n.3. In his previous appeal, Johnston also challenged "whether the court erred in allowing a pathologist to testify to the cause and manner of death of two decedents when he did not perform their autopsies." ***Johnston***, No. 2116 EDA 2009, at 1. This Court held:

> Although [Dr.] Collins's testimony did reveal the findings and/or conclusions of the doctors who conducted the autopsies, [Dr.] Collins did not merely read those findings and/or conclusions into the record. Rather, [Dr.] Collins went on to give his own opinions based on the facts in the autopsy reports and various photographs relevant to the autopsies. In doing so, he essentially indicated that he agreed with the findings and/or

conclusions of the other doctors. Also, when questioned by the court, he indicated the information on which he relied was sufficient for him to form his opinions.

[Johnston] has offered us no discussion showing that the reports and photos used by [Dr.] Collins were insufficient to inform him of the necessary facts relating to the cause and manner of the decedents' deaths. To the extent [Johnston] maintains [Dr.] Collins's testimony was inadmissible merely because he was not the autopsy doctor, [Johnston] is simply wrong. We note, too, that [Johnston] cross examined [Dr.] Collins concerning his opinions. In sum, [Johnston] was not denied his right to confront witnesses.

*Johnston*, No. 2116 EDA 2009, at 9-10. Based upon our review of Dr. Collins' trial court testimony and the current applicable law as set forth above, we agree with the prior panel of this Court. *See Warrick*, 609 A.2d at 578 n.3; *see also Ali*, 10 A.3d at 306; *Buford*, 101 A.3d at 1198. Dr. Collins testified that the examiners who initially performed the autopsies of Jamel Conner and Stephanie Labance were no longer employed by the Philadelphia Medical Examiner's Office at the time of trial, and that Dr. Collins' testimony was based upon his own conclusions after his independent review of their files. *See* N.T., 2/25/2009, at 143-45. Accordingly, the trial court did not err or abuse its discretion in admitting Dr. Collins' testimony. *See Buford*, 101 A.3d at 1198. Johnston's third issue does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/20/2015