J-S27021-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JEROME KING | |
| Appellant | No. 2533 EDA 2014 |

Appeal from the PCRA Order of August 29, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0706191-2005

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY STABILE, J.:                    **FILED JULY 28, 2015**

Appellant, Jerome King, is serving a life sentence for murder.  King's PCRA[1] case returns to this Court for the second time.  In his prior appeal, we held that the PCRA court erred in granting King and his codefendant, Esheem Haskins, new trials.  On remand, the PCRA court denied relief on King's remaining claims.  Upon review, we affirm in part, vacate in part, and remand.

In King's direct appeal, we stated the background of the case as follows:

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-46.

On February 2, 2005, [King] came up from behind Nathaniel Giles (hereinafter, the victim) and, without notice, shot him in the back of the head. Notes of Testimony (hereinafter, N.T.) at 6/19/06 at 190. Accompanying [King] was Haskins, who encouraged [King] to "Shoot him. Shoot him." *Id.* at 217. After [King] shot the victim in the head, he stepped over the victim and shot him in the neck. *Id.* at 194. The bullet fired into the victim's head was shot from approximately one foot away and entered through the right ear, and ultimately lodged in the other side of the victim's skull. *Id.* at 129, 132. The second shot was fired approximately two feet from the victim's body. *Id.* at 133. This shot split the victim's cervical spine in two, and also ripped through the victim's jugular vein and carotid artery. *Id.* at 134. The victim was pronounced dead at Temple University Hospital. *Id.* at 126.

On July 15, 2004, approximately six and a half months before he was murdered, the victim had gone to the Philadelphia Office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to speak with Special Agent Doerrer about the purchase of a Ruger .45 caliber handgun that had been used to kill Faheem Thomas–Childs.[fn4] N.T. 6/19/06 at 97–100. The victim was a straw purchaser for his neighbor, [King]. *Id.* at 107, 118. The victim admitted to Doerrer that one of the guns he purchased for the defendant was a .45 caliber [firearm]. *Id.* at 227. In his statement, the victim also admitted that he purchased the gun used to kill Faheem Thomas–Childs in May of 2003. *Id.* at 105. Subsequently, in March of 2006, the defendant admitted to a prison cell-mate, Craig Lindsey, that he had previously owned a gun used by Kennell Spady, one of the men arrested for the Faheem Thomas–Childs murder. N.T. 6/20/06 at 226–227. In fact, Faheem Thomas–Childs was killed by a bullet fired from a .45 caliber gun which was subsequently traced to Giles as the purchaser. *Id.* at 245.

> [FN4.] This was a very high profile case in Philadelphia, involving the killing of a 10 year old child during his morning walk to school. Faheem Thomas–Childs was caught in the crossfire between warring drug dealers and was fatally struck by one of approximately 50 bullets fired that morning.

Earlier in the evening on February 2, 2005, at around 8:30 p.m., S.T. and F.J.[fn5] entered a Chinese [food] store on the corner of Stillman and Cambria Streets in Philadelphia. *Id.* at 176.

Intending to carry out their food, the two girls had to wait as its preparation was not yet complete. *Id.* at 178. As they waited, Ms. T. exchanged pleasantries with the victim, whom she knew through another person. *Id.* at 180. Ms. T. then saw the victim leave the store on the corner of Stillman and Cambria Streets and begin to speak with another person, later identified as Khalief Alston. *Id.* at 181; 223. Ms. J. also witnessed the victim and Mr. Alston having a conversation outside the Chinese [food] store. N.T. 6/20/06 at 37.

> [FN5.] At the time of trial, Ms. T. and Ms. J. were aged 14 and 16, respectively. N.T. 6/19/06 at 175; N.T. 6/20/06 at 28. Their full names appear in the certified record.

While waiting for their food, both Ms. T. and Ms. J. noticed a car drive up Stillman Street to the corner where it intersected with Cambria Street.[fn6] After the car stopped for an unusually long time, the girls observed it make a left onto Cambria Street. N.T. 6/19/06 at 183–184; N.T. 6/20/06 at 34–37. Shortly thereafter, both Ms. T. and Ms. J. noticed two males approach the corner of Stillman and Cambria Streets in the direction from which the car they observed had just driven. *Id.* at 186; N.T. 6/20/06 at 39. Each identified these two men as the codefendants. *Id.* at 186; N.T. 6/20/06 at 40, 71.

> [FN6.] Crime scene investigators testified that both the Chinese [food] store and the scene of the crime on the corner of Stillman and Cambria Streets were well lit. N.T. 6/19/06 at 162–163. It was possible to see both into the store, and out of it. N.T. 6/20/06 at 314–318.

As the co-defendants approached the victim from behind, [King] shot him in the head. *Id.* at 188, 190; N.T. 6/20/06 at 39. [King] fired at the victim from a distance close enough to reach out and touch him. N.T. 6/19/06 at 190. In the process of the shooting of the victim, Ms. T. was able to see Haskins'[s] entire face. N.T. 6/19/06 at 204. Ms. J. saw the defendant from the side. N.T. 6/20/06 at 49–50. She also noticed sparks come from the black or silver pistol[-]type gun used by the defendant. N.T. 6/20/06 at 59–61. After being shot, the victim instantly fell over. N.T. 6/19/06 at 193; N.T. 6/20/06 at 41. Ms. J. then saw the victim being shot a second time, though she was not sure where this shot struck the victim. N.T. 6/20/06 at 62. As [King] shot the victim, both girls saw Haskins standing nearby. N.T. 6/19/06 at 187; N.T. 6/20/06 at 71. Ms. T. heard him scream to

[King], "Shoot him. Shoot him." N.T. 6/19/06 at 217. Though she witnessed only the defendant shoot the victim, Ms. J. saw Haskins with a gun.[fn7] N.T. 6/20/06 at 75.

> [FN7.] At the scene of the crime, police officers found a nine millimeter fired cartridge casing. N.T. 6/20/06 at 243. A nine millimeter, or .38 caliber, bullet specimen was also recovered by the medical examiner from the victim's head. *Id.*

After the shooting, everyone fled the scene of the crime. Ms. T. watched the co-defendants leave together in a car. N.T. 6/19/06 at 194, 209–210. Khalief Alston, with whom the victim was talking prior to being shot, ran up Stillman Street. N.T. 6/19/06 at 207. Startled and frightened for their lives, both witnesses also fled and headed to the home of Ms. T. N.T. 6/19/06 at 207; N.T. 6/20/06 at 47–48. Ms. T. recalled running past the victim and seeing him lying motionless, surrounded by a lot of blood. N.T. 6/19/06 at 208–209. Ms. J. related that Ms. T. had screamed in fear after seeing the shooting and continued to cry throughout the ordeal. [N.T.] 6/20/06 at 48. On their way to the home of Ms. T., the girls were almost hit by the car in which the [co-] defendants were fleeing. *Id.* at 52.

Immediately after the crime, Ms. J. went with her aunt to give a statement to Homicide detectives. *Id.* at 154. She also returned to Homicide on two subsequent occasions. On February 23, 2005, Ms. T. went with her mother to give a statement to Homicide detectives. She also returned to Homicide to provide additional information on two subsequent occasions.[fn8]

> [FN8.] Ms. T. and Ms. J. both returned to the Homicide Division on March 14, 2005[,] and on April 16, 2005, to provide additional information about the murder they had witnessed. N.T. 6/22/06 at 22, 24, 26–27.

On April 9, 2005, Detective Ron Dove, then of the Central Detectives Division, was working on unrelated matters with his partner, Detective Jim Waring, in the neighborhood where the victim was murdered. Detective Dove spoke with [King]. N.T. 6/20/06 at 170–171. Noticing his "black T-shirt with a red stop sign on it that said 'Stop Snitching' across it", Detective Dove asked him if the T-shirt was a warning. *Id.* at 175. [King] answered "Yes", and pointed at the top rear of his shirt which revealed a drawing of a tombstone with the letters R.I.P. on it.

> *Id.* Detective Dove asked him, "Is that what happens to people who snitch on you?" *Id.* He replied, "Yes." *Id.*
>
> Approximately 20 minutes later, at another location in the neighborhood, Detective Dove saw Haskins, in [King's] company, and wearing the same "Stop Snitching" T-shirt. *Id.* at 178–179.
>
> Upon learning that [King] and Haskins were wanted for murder, Detective Dove began looking for them in the neighborhood where the victim was killed. N.T. 6/22/06 at 180. He never again saw them there. *Id.* at 181. On May 6, 2005, based on information provided to the police, Detectives Dove and Waring learned that the co-defendants were staying together in room 312 of a Holiday Inn hotel on City Line Avenue. N.T. 6/20/06 at 182–183. The detectives found the two men in that room and arrested them for the murder of the victim. *Id.* at 184.

*Commonwealth v. King*, 959 A.2d 405, 407-09 (Pa. Super. 2008) (quoting Trial Court Opinion, 7/18/07, at 1-5).

Following trial, the jury convicted King of first-degree murder, criminal conspiracy, and carrying a firearm on a public street in Philadelphia.[2] The trial court imposed a life sentence followed by a consecutive term of years. On direct appeal, this Court affirmed in a published opinion. *See also Commonwealth v. Haskins*, 953 A.2d 599 (Pa. Super. 2008) (unpublished memorandum) (affirming in Haskins's case). Notably, we rejected King's claims of error in admitting (1) the victim's statements to a federal investigator that King solicited him to buy the handgun that killed Thomas-Childs; and (2) testimony that Detective Dove saw King wearing a "Stop Snitching" t-shirt.

_____

[2] 18 Pa.C.S.A. §§ 2502(a), 903(a), and 6108, respectively. Haskins was convicted of first-degree murder and criminal conspiracy.

King and Haskins filed timely first PCRA petitions. Both petitioners raised claims that the Commonwealth violated **Brady v. Maryland**, 373 U.S. 83 (1963), by not disclosing a letter seized from Alston, in which he stated that Ernest "Ezze" Cannon—and not King and Haskins—shot the victim. The PCRA court granted new trials to King and Haskins. The Commonwealth's appeals to this Court were consolidated, and we reversed.[3] **Commonwealth v. Haskins**, 60 A.3d 538, 552 (Pa. Super. 2012), *appeals denied*, 78 A.3d 1090 (Pa. 2013).

On remand, the PCRA court addressed King's remaining claims. After briefing and argument, the PCRA court determined that King was not entitled to post-conviction relief. Therefore, it sent King a Pa.R.Crim.P. 907 notice of intent to dismiss his PCRA petition without a hearing, and then a final order dismissing the petition. King appealed, raising eleven issues in his concise statement of errors complained of on appeal. The PCRA court issued a responsive opinion addressing King's issues.

Before this Court, King has reduced his assignments of error to five:

_____

[3] To prevail on a **Brady** violation claim, a defendant must show "(1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant." **Haskins**, 60 A.3d at 547 (citing **Commonwealth v. Dennis**, 17 A.3d 297, 308 (Pa. 2011)). King's and Haskins's **Brady** violation claims failed because the Alston letter was not material. **Id.** at 552.

1. After concluding that trial counsel performed deficiently in failing to object to the absence of a **Kloiber**[4] instruction, did the PCRA court commit legal error in its prejudice analysis where it focused exclusively on the inculpatory aspects of the eyewitness testimony without considering its inherent weakness or how it was impeached, failed to consider the strength of the defense case that at third party was the actual killer, and failed to consider how a proper instruction would have affected the jury in conjunction with the exculpatory evidence concealed by the Commonwealth as found by this Court on the prior appeal?

2. Did the PCRA court err in denying a hearing on the claim that trial counsel was ineffective for failing to request an instruction on how the jury was to consider evidence that a central Commonwealth witness was under investigation for serious federal crimes at the time he gave his statement to police?

3. Did the PCRA court err in denying without a hearing the claim that prior counsel were ineffective for failing to preserve the claim that the trial court erred in restricting [King's] ability to establish that a third party committed this crime?

4. Did the PCRA court err in denying without a hearing the claim challenging prior counsel's ineffective assistance in failing to (a) preserve the trial court's error in admitting overwhelming "prior bad acts" evidence that was irrelevant to begin with or whose prejudicial impact far outweighed its minimal relevant and (b) request cautionary instructions limiting the jury's consideration of this evidence for the limited purposes for which some of it was admitted?

5. Did the PCRA court err in denying the cumulative impact claim?

Appellant's Brief at 3-4.

We review the denial of relief under the PCRA "to determine whether the findings of the PCRA court are supported by the record and free of legal

_____

[4] **Commonwealth v. Kloiber**, 106 A.2d 820 (Pa. 1954).

error." ***Commonwealth v. Eichinger***, 108 A.3d 821, 830 (Pa. 2014) (quotation omitted). The PCRA court's credibility determinations bind the appellate court when they are supported by the record. ***See Commonwealth v. Paddy***, 15 A.3d 431, 442 (Pa. 2011). However, we review *de novo* the PCRA court's legal conclusions. ***See id.***

A PCRA petitioner is eligible for relief if he pleads and proves by a preponderance of the evidence that his conviction and sentence resulted from, among other grounds, "ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). The petitioner also must prove that the claim is not previously litigated or waived, and that the failure to raise the claim previously was not the result of any rational, tactical, or strategic decision by counsel. ***Id.*** § 9543(a)(3) and (4).

We presume that prior counsel rendered effective assistance. ***Paddy***, 15 A.3d at 442; ***Commonwealth v. Pierce***, 527 A.2d 973, 975 (Pa. 1987) ("We . . . presume that counsel is acting effectively."). A PCRA petitioner overcomes this presumption by meeting all three prongs of the ***Pierce*** test: "(1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness." ***Paddy***, 15 A.3d at 442. "If a petitioner fails to satisfy any prong of the ineffectiveness inquiry,

a claim of ineffective assistance of counsel will be rejected*." **Eichinger**, 108 A.3d at 830-31.

With this framework in mind, we turn to the issues King raises on appeal.

### 1. No *Kloiber* Charge

King claims that trial counsel was ineffective for failing to preserve a claim of error when the trial court did not give a **Kloiber** charge. The basis of this claim is F.J.'s failure to identify King as the shooter in her initial statement to police. The record shows that trial counsel requested a **Kloiber** charge, the trial court denied his request, and trial counsel did not except to the charge given as required by Pa.R.Crim.P. 647(B). **See** N.T. Trial, 6/21/06, at 3-4; N.T. Trial, 6/22/06, at 258. The PCRA court found that King's claim had arguable merit, but that he could not show prejudice. As set forth below, we find that King's claim lacks arguable merit.

A **Kloiber** charge admonishes the jury about the unreliability of certain eyewitness identification testimony. **Commonwealth v. Rios**, 920 A.2d 790, 804 (Pa. 2007), *overruled on other grounds by*, **Commonwealth v. Tharp**, 101 A.3d 736 (Pa. 2014). A defendant is entitled to a **Kloiber** charge if the witness (1) could not clearly see the defendant; (2) equivocates in identifying the assailant; or (3) failed to identify the defendant on one or more prior occasions. **Id.**; **see also** Pa. Sugg. Stand. Jury Instr. (Crim.) 4.07B (setting forth the suggested standard **Kloiber** charge), *cited with approval in* **Commonwealth v. Trivigno**, 750 A.2d 243,

- 9 -

253 (Pa. 2000) (Opinion Announcing the Judgment of the Court). A defendant, however, is not entitled to a *Kloiber* charge if the witness failed to identify the defendant out of fear of endangerment. ***Commonwealth v. Reid***, 99 A.3d 427, 449 (Pa. 2014).

> Our case law makes clear that the need for a *Kloiber* charge focuses on the **ability** of a witness to identify the defendant. Our Commonwealth's decisional law has long held that prior inconsistent statements based upon fear of endangerment do not equate to a prior failure of ability to identify a defendant.

*Id.* (emphasis in original). In other words, non- or misidentification out of fear of reprisal does not concern a witness's **ability** to identify the defendant.

At trial, F.J. testified that while she and S.T. were inside the Chinese takeout restaurant, they saw a car drive down Cambria Street, stop for a few seconds, and then keep going. Through the restaurant's plate glass window, F.J. saw the victim conversing with Alston. Then, she saw King approach the victim from behind and shoot him in the head. Philadelphia homicide detectives interviewed F.J. on the night of the murder. During the interview, she described the shooter as a "Black male, 25-27 years old, 6' to 6'3'', medium built, brown skin, wearing a black or dark blue skully." PCRA Court Opinion, 11/10/14, at 10-11 (quoting Commonwealth's Trial Exhibit 20). The record reflects that King is much shorter than six feet. *See* N.T. Trial, 6/20/06, at 98-100. F.J. testified at trial that during the interview, she was scared:

Q. [by the Commonwealth] Can you tell—before we go into the statement, can you tell the ladies and gentlemen of the jury what you were thinking when you sat down to speak to a Homicide detective in the Homicide Division two hours after the shooting?  What were you thinking?

[Counsel for King]: Objection, Your Honor.

THE COURT: Overruled.

A. [by F.J.] What was I thinking?

Q. [by the Commonwealth] Yes.

A. I was scared.  Like, I didn't want to really say nothing because I—it was just—like I was really scared, so . . .

Q. You said that you were scared and you didn't want to say anything.

A. 'Cause I was just too scared to say anything.

N.T. Trial, 60/20/06, at 57.  F.J. was also questioned during redirect examination about her fear.  During her second interview by Homicide Division detectives, F.J. was asked whether she had left out details during her first interview:

Q. [by the Commonwealth] [Haskins's counsel] asked you questions about whether you were misleading or words to that effect.  Do you remember being asked questions about this, specifically third question down.  Were you interviewed here at Homicide before?  Remember being asked that question?

A. [by F.J.] Yes.

Q. Tell the ladies and gentlemen of the jury what you told the detectives  on April 16th of 2005.  Read them your answer.

A. It say, "Yes."

Q. (Reading): Yes.  But I was scared because I was there when he was shot, and I saw the people who did this.

Those are the words that you spoke to the detectives?

A. Yes, it was.

- 11 -

Q. **Question**: Did you tell the entire truth when you were first interviewed?

**Answer**: No, because I was really scared. I did not want—I did not want people to know that I was there, but some neighbors saw me out there.

Is that what you told the detective?

A. I don't remember saying that.

N.T. Trial, 6/20/06, at 112-13 (boldface in original). Philadelphia Police Officer John Benham went to F.J.'s house the night of the murder to take her to be interviewed. He testified that, at F.J.'s house, the lights were turned off and the curtains were drawn. *Id.* at 152-53. When he finally coaxed F.J. to come out, she was "very distraught, crying . . . very shaken up[, v]ery scared." *Id.*

The PCRA court found arguable merit to King's claim, because during a sidebar at trial, the Commonwealth conceded that F.J.'s initial statement to police contained an equivocal identification of the shooter. *See* PCRA Court Opinion 11/10/14, at 11 (quoting N.T. Trial, 6/20/06, at 63-64). We disagree with the PCRA court's evaluation, because—in context—the Commonwealth was informing the trial judge that F.J. equivocated because she was scared. *See* N.T. Trial, 6/20/06, at 62-68 ("When [F.J.] first described these events, she was scared.").

Thus, a *Kloiber* charge was inapposite. F.J. initially equivocated in identifying King as the shooter because she was scared. Our case law makes clear that non-identification out of fear does not equate to an inability to identify. *Reid*, *supra*. There is no evidence that F.J. could not clearly

see King, who she knew from the neighborhood. The record contradicts King's claim that hooded sweatshirts obscured his and Haskins's faces. *See* PCRA Court Opinion, 11/10/14, at 9-10. Regarding the second and third circumstances supporting a *Kloiber* charge, the evidence supports the Commonwealth's argument that F.J. did not initially identify King as the shooter because of fear. Thus, her failure to identify had nothing to do with her **ability** to see King. *See Reid*, *supra*. Moreover, after her first police interview, F.J. consistently identified King as the shooter and Haskins as his accomplice, including at trial. Therefore, a *Kloiber* instruction was not required in King's case.

In sum, King's claim of ineffectiveness regarding counsel's failure to seek a *Kloiber* charge lacks arguable merit. We are not bound by the PCRA court's contrary legal conclusion, and we may affirm on any basis supported by the record. *See Commonwealth v. Wiley*, 966 A.2d 1153, 1157 (Pa. Super. 2009). Because King cannot meet the arguable merit prong of the *Pierce* test, his first claim fails. *See Eichinger*, 108 A.3d at 830-31. Accordingly, we need not address whether the absence of a *Kloiber* instruction prejudiced King.

**2. Jury instruction regarding the victim's statement**

King next argues the PCRA court erred in denying a hearing on his claim that trial counsel was ineffective for failing to request an instruction regarding the statement of the victim. Specifically, King argues his trial counsel should have requested the trial court to instruct the jury that the

- 13 -

victim had a motive to lie when speaking to federal authorities, because the

victim was under investigation for serious federal crimes.

> [ATF] Special Agent Doerrer interviewed Mr. Giles[, the victim,] in July 2004 concerning an investigation into the purchase of a .45 caliber handgun used in the killing of Faheem Thomas–Childs. Following a pretrial evidentiary hearing pertaining to the admissibility of evidence, the trial court permitted Commonwealth witness Special Agent Doerrer to read Mr. Giles's statement into evidence. The verbatim rendition revealed that: (1) [King] solicited Mr. Giles's assistance on two separate occasions to purchase three handguns, a .45 caliber Ruger, another .45 caliber pistol, and a .357 caliber Smith & Wesson; (2) [King] promised compensation to Mr. Giles in exchange for making the purchases as [King] could not pass the background checks required to purchase the handguns himself; and (3) Mr. Giles was afraid of [King].

*King*, 959 A.2d at 411 (citing N.T. Trial, 6/19/06, at 120-21). On direct

appeal, we noted that the victim's statement, whether true or false, was

evidence of King's motive to silence the victim by murdering him:

> In the case *sub judice,* the Commonwealth sought to establish [King's] retaliatory motive for killing Mr. Giles by showing that Mr. Giles cooperated in the Thomas–Childs murder investigation wherein he revealed potentially incriminating information concerning [King]. **To that extent, the jurors were not asked to believe material details of the two straw arms purchases, that is, the truth of the matter asserted, to comprehend the probative value of Mr. Giles's statement**. Indeed, we concur with the Commonwealth's premise that the evidence was highly relevant to establish the motive for the shooting. We therefore conclude that the statement, if it had been offered solely as motive, would not have constituted hearsay and would have been properly admitted.

*Id.* at 412 (emphasis added). However, since the jury was given no limiting

instruction, the statement was to be considered for its truth, *i.e.*, as

hearsay, *vis-à-vis* admissibility. ***Id.*** We held that the trial court properly admitted the statement as proof that King murdered the victim to prevent him from testifying against King, under the forfeiture by wrongdoing hearsay exception. ***See*** Pa.R.E. 804(b)(6).

This claim lacks arguable merit. Assuming, for argument's sake, that the victim lied to Special Agent Doerrer, those lies do not diminish King's motive to murder. Indeed, we concluded as much on direct appeal. King killed the victim because of his mere cooperation, not necessarily because he was truthful in becoming a federal informant. The purpose of impeachment is to undermine the truthfulness of a witness's testimony or, as here, a declarant's hearsay statement. ***See*** Black's Law Dictionary 820-21 (9th ed. 2009) (defining impeachment, in relevant part, as "the act of discrediting a witness, as by catching the witness in a lie or by demonstrating that the witness has been convicted of a criminal offense"). King repeatedly notes the jury was never informed how to assess the victim's bias and motive to fabricate (because of potential federal charges), but he fails to acknowledge that the victim's statement was relevant even if completely fabricated.

King cites cases concerning an accused's ability to inquire into a testifying witness's pending criminal proof of bias or motive to lie. ***See*** Appellant's Brief at 29-32. For example, ***Commonwealth v. Evans***, 512 A.2d 626, 631 (Pa. 1986), held that trial court erred in limiting the defendants' cross-examination of a cooperating coconspirator. Similarly, in ***Commonwealth v. LaMassa***, 532 A.2d 450, 451 (Pa. Super. 1987), we

held the trial court erred in refusing an instruction on the Commonwealth's principal witness's prior convictions for crimes of falsehood. In *Commonwealth v. Thompson*, 739 A.2d 1023, 1030-31 (Pa. 1999), our Supreme Court found "problematic" the trial court's instruction that the jury should not consider a witness's open criminal cases, though it ultimately rejected the claim of error.

In all of these cases, however, the witnesses' testimony was relevant for its truth, because it incriminated the defendants. The coconspirator *Evans* placed the defendants at the scene of the armed robbery and murder. *Evans*, 512 A.2d at 629. The principal witness in *LaMassa* was the victim who testified the defendant kidnapped and robbed him. *LaMassa*, 532 A.2d at 450-51. Finally, the witness in *Thompson* testified that the defendant confessed to killing the victim for money. *Thompson*, 739 A.2d at 1027, 1030. None of these cases concerned statements that were relevant regardless of whether they were true—as here. Again, the victim's statement was relevant merely because it existed. The only purpose for King's proposed instruction would have been to cast doubt on the truth of the victim's statement—a statement relevant even if false. In sum, this claim lacks arguable merit.

King's claim additionally fails because he cannot show prejudice. The only prejudice he claims is the inability to impeach the victim's statement. King fails to state how the absence of a cautionary instruction undermined

the jury's guilty verdict. Therefore, the PCRA court did not err in denying King a hearing on this claim.

## 3. Failing to preserve claim that trial court restricted King's ability to shift guilt to a third party

Next, King claims the PCRA court erred in denying him the ability to present testimony, through Khalief Alston, that Ernest Cannon was the actual murderer.[5] Specifically, King claims that trial counsel erred in failing to object when the trial court excluded evidence of Cannon's motive to murder the victim, and of Cannon's multiple pending murder charges. Recognizing that the latter evidence is propensity evidence (Cannon allegedly murdered other people; therefore he murdered Giles in accordance with his character trait as a murderer), King suggests Cannon's other acts must be admitted as a matter of due process so that King could attempt to exonerate himself. This claim lacks arguable merit.

"A defendant has a fundamental right to present evidence, so long as the evidence is relevant and **not subject to exclusion under our Rules of Evidence**." **Commonwealth v. Patterson**, 91 A.3d 55, 71 (Pa. 2014)

---

[5] Alston and Cannon are each currently serving multiple life sentences for murder. **See Commonwealth v. Cannon**, 22 A.3d 210, 215 & n.4 (Pa. 2011) (reversing this Court's granting of a new trial to Cannon); **Commonwealth v. Alston**, No. CP-51-CR-0700412-2005, 2013 WL 9863768 (C.P. Phila. Oct. 10, 2013) (denying PCRA relief to Alston in an unrelated case), *aff'd*, 107 A.3d 237 (Pa. Super. 2014) (unpublished memorandum).

(emphasis added). In this case, King essentially claims trial counsel ineffectiveness, because he did not more aggressively use evidence tending to show that Cannon killed the victim. "Reverse Rule 404(b) evidence" refers to a defendant's use of other acts evidence under Pa.R.E. 404(b)[6] to show that a third party had committed the crime at issue. *See United States v. Stevens*, 935 F.3d 1380, 1404 (3d Cir. 2001) (construing the materially similar Fed.R.Evid. 404(b)). No Pennsylvania court has squarely addressed the use of reverse Rule 404(b) evidence, though several have mentioned the concept obliquely. *See, e.g., Patterson*, 91 A.3d at 71-72

---

[6] Pennsylvania Rule of Evidence 404(b) provides:

**(b) Crimes, Wrongs or Other Acts.**

*(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

*(3) Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b).

(holding trial court did not err in precluding evidence of a third party's motive to commit the crime, because "[a]ppellant offered no evidence to suggest that [the third party] was charged, let alone convicted, of a crime that bore substantial similarity to those with which [a]ppellant was charged"); ***Commonwealth v. Weiss***, 81 A.3d 767, 806-07 (Pa. 2013) ("[T]he defense may introduce evidence that someone else committed a crime which bears a highly detailed similarity to the crime with which the defendant is charged.") (internal quotation omitted); ***Commonwealth v. Chmiel***, 889 A.2d 501, 534-35 (Pa. 2005) (holding that trial court properly precluded defendant from questioning witness concerning prior burglary which did not fall within permitted purposes of Rule 404(b) but merely tended to establish action in conformity with the prior act).

King unabashedly admits that he believes trial counsel should have introduced evidence of Cannon's murder charges to show that Cannon had the propensity to murder, and therefore killed the victim. ***See*** Appellant's Brief at 40. Rule 404(b)(1) expressly prohibits this tactic, and ***Stevens***, cited by King, is both inapposite and distinguishable.

> As explained herein, [the appellant] misreads ***Stevens***, and we write to clarify that **Rule 404(b)'s proscription against propensity evidence applies regardless of by whom, and against whom, it is offered**. Under ***Stevens***, we grant defendants more leeway in introducing "bad acts" evidence under one of the Rule 404(b) exceptions—requiring only that its probative value is not substantially outweighed by Rule 403 considerations such as unfair prejudice, undue delay or confusion of the issues. **But *Stevens* did not afford defendants more leeway in admitting propensity evidence**

> **in violation of the prohibition of Rule 404(b)**. Because the only purpose for which [the appellant] sought to introduce [another person's] prior conviction was to show that he has a propensity to carry firearms, the [d]istrict [c]ourt correctly excluded the evidence.

***United States v. Williams***, 458 F.3d 312, 314 (3d Cir. 2006); ***see also***

***Wynne v. Renico***, 606 F.3d 867, 870-71 (6th Cir. 2010) (holding *habeas* petitioner's constitutional right to present a complete defense was not violated by state rule of evidence that precluded the use of propensity evidence against a third party). Thus, a criminal defendant cannot use a third party's murder charges to show that the third party committed the instant murder merely because the third party has a general propensity to murder.

We find ***Williams***, together with ***Patterson***, ***Weiss***, and ***Chmiel***, persuasive. Rule 404(b) precluded King from admitting evidence of Cannon's murders to show that he had a propensity to murder and, therefore, killed the victim in this case. King argues that he should have been able to introduce propensity evidence tending to show Cannon was the real killer because it was highly relevant. That argument misses the point, because Rule 404(b)(1) makes propensity evidence inadmissible subject to Rule 404(b)(2)'s limited exceptions. ***See Commonwealth v. Hicks***, 91 A.3d 47, 53 (Pa. 2014). King's claim of an alleged lack of prejudice to the Commonwealth also misses the mark. The prejudice inquiry required in criminal cases by the second sentence of Rule 404(b)(2), ***see*** footnote 6, ***supra***, comes into play only if the other acts evidence is admissible under

- 20 -

Rule 404(b)(2), *i.e.*, for a purpose other than showing propensity. In other words, any lack of prejudice does not nullify Rule 404(b)(1)'s prohibition against propensity evidence. Because King's purpose in introducing Cannon's murder charges was to show his propensity to commit murder—which is barred by Rule 404(b)(1)—he cannot show that his claim has arguable merit.

Additionally, we reject King's argument to the extent he contends trial counsel was ineffective in failing to flesh out Cannon's motive to kill the victim. We have reviewed the record, and King has not stated what evidence of Cannon's motive to kill was wrongly excluded because of trial counsel's ineffectiveness. Further, King has failed to link Cannon's unrelated murder charges in any meaningful way to the killing of the victim. The evidence shows that Cannon killed his other victims after robbing them, **see** N.T. Trial, 6/22/06, at 80-84, while the victim here was murdered in retaliation for cooperating with authorities.

Even if King could show arguable merit, he cannot show prejudice. Much of the evidence that King claims the trial court excluded was actually admitted. First, Alston testified that Cannon told him, upon seeing the victim, "[t]here go that boy supposed to be telling on Lemon[7]" N.T. Trial, 6/21/06, at 102. Although the trial judge admonished Alston not to testify

---

[7] "Lemon," King's nickname, was extensively referenced at trial.

about what other people said, she did not strike from the record Alston's testimony. Second, Alston testified that Cannon—and not King—murdered the victim by shooting him in the head. *Id.* at 103. King's trial counsel emphasized Alston's testimony in closing argument, telling the jury, "[i]f Ernie Cannon committed this murder, then you got the wrong man." N.T. Trial, 6/22/06, at 125.

Also, despite objections from the Commonwealth, Alston testified about his knowledge of Cannon's murders. Alston admitted to giving a statement to police about murders he and Cannon allegedly committed. N.T. Trial, 6/21/06, at 169. Alston further admitted that he and Cannon were suspected of murdering Robert Sample. *Id.* at 174-76. He stated that Cannon confessed to him that he murdered a man named "Gene." *Id.* at 176-77. Furthermore, Philadelphia Police Detective Gerald Lynch testified that Alston and Cannon were suspected of committing robbery/murders together. N.T. Trial, 6/22/06, at 80-84. Thus, the jury was aware that Cannon was accused of multiple murders.

In sum, we reject King's claim. The PCRA court correctly found that it lacks arguable merit, and King additionally cannot show prejudice.

### 4. Failing to preserve error on prior bad acts evidence

Next, King contends that prior counsel were ineffective for failing to preserve error related to the admission of King's prior bad acts. This other acts evidence included (1) evidence linking King to the high-profile murder of Thomas-Childs; (2) his status as leader of the "Lemon squad" of

gangsters; (3) his illegal purchase and sale of handguns; (4) his involvement in an unrelated drowning murder; and (5) his opinion that citizens should not cooperate with police. King contends that such evidence was wrongly admitted, and trial counsel was ineffective in failing to object and also in failing to request cautionary instructions.

We reject King's claim to the extent he contends trial counsel was ineffective for allowing other acts into evidence. The PCRA court noted that the above evidence was admissible for other purposes permitted under Rule 404(b)(2). We find no error in the PCRA court's reasoning. Indeed, the admissibility of several of the above items was previously litigated on direct appeal. *See King*, 959 A.2d at 418-19 (determining that trial court did not abuse its discretion in admitting testimony relating to drowning murder and King's anti-authority sartorial choices). The PCRA bars relief if a claim is previously litigated. *See Commonwealth v. Tedford*, 960 A.2d 1, 16 (Pa. 2008) (noting that a PCRA petitioner cannot satisfy the arguable merit prong of the *Pierce* test where the underlying legal claim was rejected on direct appeal).

However, merely because the evidence was admissible does not resolve whether trial counsel should have requested instructions to the jury explaining the limited purpose for its admissibility. Indeed, when a defendant's prior bad acts are properly admitted other than as propensity evidence, a defendant is entitled to a jury instruction that the other acts are not proof of his guilt. *Commonwealth v. Billa*, 555 A.2d 835, 841-42 (Pa.

- 23 -

1989), *abrogated on other grounds by*, **Commonwealth v. Freeman**, 827 A.2d 385 (Pa. 2003); **Commonwealth v. Amos**, 284 A.2d 748, 750 (Pa. 1971) ("Of course, the potentially prejudicial effect of the introduction of the defendant's record requires that the jury be made aware of the limited purpose of such evidence."). In **Billa**, for example, the Commonwealth admitted evidence of the defendant's prior rape and attempted murder of another victim to prove his motive and intent to murder, as well as to rebut his claim of accidental death. **Billa**, 555 A.2d at 841. Our Supreme Court upheld the trial court's admission of this evidence, but nevertheless reversed the defendant's conviction, holding that trial counsel was ineffective for failing to request an appropriate limiting instruction. **Id.** at 843.

In this case, we are constrained to disagree with the PCRA court's conclusion that the evidence's admissibility meant that trial counsel was not ineffective for failing to request a cautionary instruction. As stated in **Billa**, where other acts evidence is admissible under Rule 404(b), a defendant is entitled to a cautionary instruction so that the jury does not use the other acts as propensity evidence. Nor can we agree that the reference to King's other criminal acts was fleeting. Rather, it pervaded the entire trial, as King notes in his brief.

In finding that trial counsel's failure to request a limiting instruction has arguable merit, we express no opinion as to the other two prongs of the **Pierce** test. A finding that trial counsel had no reasonable basis for his or her chosen course of action generally requires evidence, and the PCRA court

- 24 -

dismissed King's claim without a hearing. ***Cf. Commonwealth v. Reyes-Rodriguez***, 111 A.3d 775, 783-74 (Pa. Super. 2015) (*en banc*) (holding that, where a PCRA petitioner fails to develop an evidentiary record at a hearing, he cannot show counsel lacked a reasonable basis for failing to request cautionary instructions).  We further decline to address whether King was prejudiced by any ineffectiveness in this regard.  We hold only that King is entitled to an evidentiary hearing to develop a record to support his claim.

## 5. Cumulative prejudicial impact of claims

In his final claim, King argues that the cumulative prejudicial impact of his claims entitles him to relief.  When post-conviction claims are rejected for lack of merit or arguable merit, no basis exists for an accumulation claim. ***Commonwealth v. Koehler***, 36 A.3d 121, 161 (Pa. 2012).  "When the failure of individual claims is grounded in lack of prejudice, however, then the cumulative prejudice from those individual claims may properly be assessed." ***Id.***

Although we remand for an evidentiary hearing only on King's fourth claim only, King cannot ultimately prevail, *i.e.*, gain a new trial, on his accumulation claim.  This is so because he has only one claim with merit or arguable merit.  In this appeal, we have found that all other substantive claims of ineffective assistance lack arguable merit.  In King's prior PCRA

appeal, we found that King's **Brady** violation claim lacked merit, because he could not show the withheld evidence was material.[8]  **Haskins**, 60 A.3d at 552. Thus, because King possesses only one claim of arguable merit, it is impossible for him to show cumulative prejudice.  As our Supreme Court has repeatedly stated, "'no number of failed claims may collectively warrant relief if they fail to do so individually.'  Accordingly, where claims are rejected for lack of arguable merit, there is no basis for an accumulation claim.  **Commonwealth v. Bomar**, 104 A.3d 1179, 1216 (Pa. 2014) (quoting **Commonwealth v. Washington**, 927 A.2d 586, 617 (Pa. 2007)).

In sum, the PCRA court erred in finding that King's fourth claim lacked arguable merit, and therefore abused its discretion in denying a hearing on that claim.  It did not err in denying relief on all other claims raised on appeal.  Accordingly, we affirm in part, vacate in part, and remand for an evidentiary hearing limited to King's fourth claim only, *i.e.*, whether he can meet the other prongs of the **Pierce** test regarding trial counsel's failure to

_____

[8] We cannot revisit our prior holding in this appeal.  **See Commonwealth v. Viglione**, 842 A.2d 454, 46-162 (Pa. Super. 2004) (*en banc*) (quoting **Commonwealth v. Starr**, 664 A.2d 1326, 1331 (Pa. 1995)) ("Among the related but distinct rules which make up the law of the case doctrine are that . . . upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court . . . ."). However, even though King did not prevail in the prior appeal, we reiterate our disapproval of the Commonwealth's conduct.  **See Haskins**, 60 A.3d at 549-50; **id.** at 552 (Bowes, J., concurring).

request a jury instruction explaining the limited purpose of the Rule 404(b) evidence admitted at trial.

Order affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/28/2015